# United States Court of Appeals

*for the*

# Third Circuit

Case No. 24-2319

EHI ACQUISITIONS, LLC,

*Plaintiff/Appellant,*

— v. —

UNITED STATES OF AMERICA,

*Defendant/Appellee.*

ON APPEAL FROM AN ORDER OF THE DISTRICT COURT FOR THE
DISTRICT OF THE VIRGIN ISLANDS IN NO. 3-22-CV-00044,
HONORABLE CHERYL ANN KRAUSE, CIRCUIT JUDGE

## BRIEF AND APPENDIX FOR PLAINTIFF/APPELLANT
## Volume I of III (Pages Appx1-Appx26)

JULIEN A. ADAMS
GREGORY S. DOVEL
DOVEL & LUNER
201 Santa Monica Boulevard, Suite 600
Santa Monica, California 90401
(310) 656-7066

CRAIG M. O'SHEA
DUDLEY NEWMAN FEUERZEIG LLP
P.O. Box 756
1000 Frederiksberg Gade
Saint Thomas, Virgin Islands 00802
(340) 774-4422

*Attorneys for Plaintiff/Appellant*

CP COUNSEL PRESS   (800) 4-APPEAL • (333016)

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Appellant EHI Acquisitions, LLC states as follows:

1.      Appellant's parent corporation is Ataraxia Hospitality, LLC.

2.      There are no publicly held companies that own stock in Appellant or its parent, or that hold a 10% or greater ownership interest in Appellant or Appellant's parent.

3.      Appellant is unaware of any other publicly held corporation that is not a party to this proceeding that has a financial interest in the outcome of this proceeding.

4.      This case does not arise out of a bankruptcy proceeding.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ........................................................................i

TABLE OF AUTHORITIES .........................................................................v

STATEMENT OF JURISDICTION.............................................................1

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF RELATED PROCEEDINGS .......................................2

INTRODUCTION ........................................................................................3

STATEMENT OF THE CASE.....................................................................5

    I.    Facts...................................................................................................5

        A.    JHPI and the Government enter an Indenture to ensure the successful commercial operation of the Caneel Bay Resort ...........................................................................5

        B.    EHI acquires and operates the Resort .........................................8

        C.    EHI invokes the put procedure .................................................9

        D.    The importance of the Caneel Bay Resort to the Virgin Islands ...................................................................................10

    II.    Proceedings ......................................................................................11

    III.    Rulings...............................................................................................11

SUMMARY OF ARGUMENT ...................................................................12

ARGUMENT ...............................................................................................13

    I.    Standard of review...........................................................................13

    II.    EHI proffered material facts that were not disputed by the Government and that must be accepted as true for purposes of the motions ...................................................................................14

    III.    The objective intent of the parties was that EHI could propose to convey the Improvements for value.................................15

ii

A. The objective intent of the parties is found in the plain meaning of the words in context as established by objective sources (such as dictionaries)....................................15

B. The phrase "an offer" appears in a commercial context in the Indenture ........................................................18

    1. The 1983 indenture was a commercial contract instrument, not a deed of gift............................18

    2. The "an offer" provision in paragraph 8 served a commercial purpose........................................21

C. The plain meaning of "an offer" encompasses a proposed transfer for value ......................................23

    1. The phrase "an offer" is used in the Indenture as a term of art meaning a proposed exchange for value................................................................24

    2. The non-legal ordinary meaning of "an offer" also encompasses "a proposed transfer for value" .........29

    3. The district court erroneously failed to apply the unambiguous meaning ....................................31

D. EHI's interpretation of "an offer" is the only interpretation that makes sense of the Improvements..............34

III. The district court's reasoning does not support its failure to apply the objective intent of the parties ...............................39

A. The district court erroneously concluded that because paragraph 8 does not say "an offer to convey for value" it cannot encompass a proposal to convey "for value"............39

B. The district court erroneously reasoned that requiring payment for improvements is inconsistent with giving the land for free .......................................................42

C. The district court erroneously relied on paragraph 2................45

D. The district court erroneously concluded that early termination and expiration are identical in that "the land and improvements wind up in a single set of hands".......................................................................47

E.    The district court erroneously relied on its assumption
      that the Government would not agree to a "sudden
      demand" that would cause it to "forfeit" the land ...................47

F.    The district court erroneously concluded that an offer
      to transfer for value renders the expiration provision
      "superfluous" ...........................................................................50

IV.   None of the Government's proffered extrinsic evidence
      addressed the meaning of "an offer"...................................................50

V.    EHI is entitled to summary judgment ..................................................53

A.    EHI held the right to reversion of the land ...............................54

B.    EHI submitted a valid offer that the Government failed
      to accept, thereby triggering reversion to EHI..........................56

CONCLUSION .........................................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Addie v. Kjaer*,
737 F.3d 854 (3d Cir. 2013) ..........................................................................28

*Aleynikov v. Goldman Sachs Grp., Inc.*,
765 F.3d 350 (3d Cir. 2014) .........................................................................17

*Amgro, Inc. v. Lincoln Gen. Ins. Co.*,
361 Fed. App'x 338 (3d Cir. 2010) ..............................................................55

*Anglemeyer v. Ammons*,
92 F.4th 184 (3d Cir. 2024) ............................................................ 14, 21, 23

*Arvidson v. Buchar*,
72 V.I. 638 (Super. Ct. 2020) ................................................ 16, 17, 34, 47

*Baldwin v. Univ. of Pittsburgh Med. Ctr.*,
636 F.3d 69 (3d Cir. 2011) ...........................................................................16

*Bill Gray Enters. v. Gourley*,
248 F.3d 206 (3d Cir. 2001) .................................................................. 34, 50

*Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*,
247 F.3d 79 (3d Cir. 2001) ...........................................................................51

*Buono Sales, Inc. v. Chrysler Motors Corp.*,
449 F.2d 715 (3d Cir. 1971) .........................................................................17

*Chestnut v. Goodman*,
59 V.I. 467 (V.I. 2013) ...................................................................................41

*Christopher v. Skinner*,
No. ST-13-CV-575, 2014 V.I. LEXIS 147
(V.I. Super. Sept. 26, 2014).........................................................................54

*Coolspring Stone Supply v. Am. States Life Ins. Co.*,
10 F.3d 144 (3d Cir. 1993) ...........................................................................13

*Cruz v. St. Croix Fin. Ctr., Inc.*,
2024 V.I. Supreme LEXIS 11 (V.I. 2024) ...................................................34

*De Jesus v. David*,
25 V.I. 80 (Terr. Ct. 1990)............................................................................18

*Defoe v. Phillip*,
   56 V.I. 109 (2012) ............................................................ 17, 23, 28

*Drayton v. Drayton*,
   65 V.I. 325 (V.I. 2016) .......................................................... 41, 42

*George v. Lindesay*,
   22 V.I. 42 (Terr. Ct. 1986)...............................................................19

*Hepp v. Facebook*,
   14 F.4th 204 (3d Cir. 2021) ............................................................28

*Isidor Paiewonsky Assocs. v. Sharp Props.*,
   761 F. Supp. 1231 (D.V.I. 1991) ....................................... 25, 29

*Jersey Cent. Power & Light Co. v. Lacey*,
   772 F.2d 1103 (3d Cir. 1985) ............................................ 14, 15

*Lorenz v. CSX Corp.*,
   1 F.3d 1406 (3d Cir. 1993) ..............................................................16

*Maxwell v. Moore*,
   63 U.S. 185 (1859)............................................................................54

*McDonald v. Davis*,
   No. 2004-93, 2009 U.S. Dist. LEXIS 17309 (D.V.I.
   Mar. 5, 2009) ................................................................ 50, 51, 53

*McIntosh v. Prince*,
   9 V.I. 3 (Mun. Ct. 1971) ..................................................................19

*Medtronic AVE Inc. v. Advanced Cardiovascular Sys.*,
   247 F.3d 44 (3d Cir. 2001) ..............................................................55

*Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*,
   619 F.2d 1001 (3d Cir. 1980) ..........................................................17

*Pac. Emplrs. Ins. Co. v. Glob. Reinsurance Corp. of Am.*,
   693 F.3d 417 (3d Cir. 2012) ............................................................31

*Pension Transfer Corp. v. Beneficiaries under the Third Amend. (In re
   Fruehauf Trailer Corp.)*,
   444 F.3d 203 (3d Cir. 2006) ............................................................54

*Peppertree Terrace v. Williams*,
   52 V.I. 225 (V.I. 2009) .....................................................................24

*Phillip v. Marsh-Monsanto*,
  66 V.I. 612 (2017) ............................................................ 16, 17, 32

*RLF Nazareth, LLC v. York RSG (Int'l), Ltd.*,
  No. 3:19-cv-0071, 2023 U.S. Dist. LEXIS 119639
  (D.V.I. July 12, 2023) ....................................................................15

*Roy v. Banco Popular de P.R.*,
  No. ST-2014-CV-00306, 2017 V.I. LEXIS 185
  (V.I. Super. Mar. 28, 2017) ..................................................... 25, 28

*SBP v. Family Props. Caribbean*,
  No. ST-2010-CV-00357, 2011 V.I. LEXIS 161
  (V.I. Super. Apr. 8, 2011) ................................................. 24, 25, 29

*SEC v. Bonastia*,
  614 F.2d 908 (3d Cir. 1980) .........................................................14

*Stendardo v. Fed. Nat'l Mortg. Ass'n*,
  991 F.2d 1089 (3d Cir. 1993) ......................................................20

*Streibich v. Underwood*,
  74 V.I. 488 (2021) ......................................................................16

*Todd v. Blake*,
  No. 3:17-cv-0012, 2023 U.S. Dist. LEXIS 52715
  (D.V.I. Mar. 28, 2023) .................................................................15

*Trading Techs. Int'l v. Ibg Llc*,
  No. 10 C 715, 2020 U.S. Dist. LEXIS 259896
  (N.D. Ill. Oct. 21, 2020) ....................................................... 24, 27

*Ubiles v. People of the V.I.*,
  66 V.I. 572 (2017) ............................................................ 17, 23, 29

*United States v. Dawson*,
  32 F.4th 254 (3d Cir. 2022) ..........................................................28

*Weary v. Long Reef Condo. Ass'n*,
  57 V.I. 163 (2012) .............................................................. 17, 31

*Williams v. Medley Opportunity Fund II, LP*,
  965 F.3d 229 (3d Cir. 2020) .........................................................15

*Zinner v. Olenych*,
  108 F. Supp. 3d 369 (E.D. Va. 2015) ..................................... 24, 27

**Statutes & Other Authorities:**

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1346(f) .............................................................................1

28 U.S.C. § 2409a(d) .........................................................................53

1 V.I. Code § 42 ................................................................ 17, 23, 28

American Heritage Dict. of the English Language (4th ed. 2000) .........................29

Black's Law Dictionary (5th ed. 1979) ................................... 16, 25, 28

Black's Law Dictionary (7th ed. 1999) ........................................ 30, 32

Black's Law Dictionary (9th ed. 1999) ................................................24

Cambridge Dictionary of American English (2d ed. 2007)...................................30

Fed. R. Civ. P. 56(c)...........................................................................14

Fed. R. Civ. P. 56(c)(1)(A) .................................................................14

Fed. R. Civ. P. 56(e)(2).......................................................................15

Fed. R. Civ. P. 59 ................................................................................1

LRCi 56.1 ..........................................................................................14

Merriam-Webster's Collegiate Dictionary (11th ed. 2009)....................................30

Random House Webster's Unabridged Dictionary (2d ed. 2001).........................30

Restatement (Second) of Contracts, § 24 (1981)............................... 25, 28

Webster's Third New International Dictionary Unabridged (2002) .......................29

## STATEMENT OF JURISDICTION

Because this action sought to quiet title to real property in which the United States claimed an interest, the district court had subject matter jurisdiction. 28 U.S.C. § 1346(f). The district court's orders on the parties' motions for summary judgment disposed of all parties' claims, and this Court has appellate jurisdiction over a final decision of a district court. 28 U.S.C. § 1291. The district court entered its summary judgment orders on April 22, 2024. On May 3, 2024, EHI timely filed a Rule 59 motion to alter or amend those summary judgment orders. The district court denied EHI's motion on May 22, 2024. Within 60 days, on July 17, 2024, EHI timely filed a notice of appeal.

## STATEMENT OF ISSUES

This case turns on the meaning of the phrase "an offer ... to convey and transfer ... improvements" that appears in an indenture contract. The district court concluded it means "an offer to convey the improvements free of charge" because "the context of the whole Indenture" was "entirely philanthropic."

1.     The district court was required to accept Appellant EHI's evidence as true for purposes of the Government's summary judgment motion. This evidence (which was not disputed by the Government) established that the phrase "an offer" appeared in the context of four pages of commercial provisions and served a commercial (not philanthropic) purpose. The district court ignored those

undisputed facts and instead declared that the context was "entirely philanthropic." Did the district court err? Appx467-469 (Appellant's MSJ brief); Appx1030-1033 (Appellant's MSJ reply); Appx10-14 (Order).

2.     The phrase "an offer" is coupled with a required "acceptance" and appears in a commercial legal context. In that context, "offer" and "acceptance" are well-known legal terms of art, and "an offer" means "the manifestation of a willingness to enter into a bargain." Controlling law mandates that terms of art "shall be construed" to have their specialized meaning. Should "an offer" be given its meaning as a term-of-art? Appx474-476; Appx14-15.

3.     If a court concludes that contract language has an unambiguous plain meaning, controlling law requires that this plain meaning must be applied, and not altered. When "an offer" is not used as a term of art, both parties agreed (and the district court concluded) that its unambiguous plain meaning is "an act or instance of presenting something for acceptance." Does the plain meaning of "an offer" encompass a proposed transfer for value? Appx476-478; Appx14-20.

## STATEMENT OF RELATED PROCEEDINGS

EHI is not aware of any other related case or proceeding, completed, pending, or contemplated before any court or agency.

# INTRODUCTION

This appeal concerns whether "an offer" to convey title to a commercial resort encompasses a proposal to convey title in exchange for value. As used in the contract at issue here, the phrase "an offer" is coupled with "acceptance," and is a legal term of art meaning "a manifestation of willingness to enter into a bargain." This meaning unambiguously encompasses a proposal to enter into a bargain, i.e., an exchange for value. The district court refused to give "an offer" this meaning because it concluded that "an offer" is not a term of art. That conclusion is contrary to both controlling law and common understanding of contractual language.

Moreover, when not used as a term of art, the ordinary meaning of "an offer"—as confirmed in dictionaries—also encompasses an offer to convey title in exchange for value. Both parties agreed, and the district court held, that the "unambiguous" ordinary meaning of "an offer" is an "act or instance of presenting something for acceptance." This meaning also encompasses a proposed transfer for value. To propose to transfer property for value *is* "to present something for acceptance or rejection." So under either definition, "an offer" unambiguously encompasses a proposed transfer for value.

The context of the contract in which the phrase appears also confirms that "an offer" encompasses a proposed transfer for value. The contract gifted the land

that the resort sits on to the Government, but expressly did not gift the resort itself. Instead, ownership of the resort improvements remained with the grantor or its affiliate, and the operator of the resort held a Retained Use Estate to continue operating the resort as a for-profit enterprise. The contract had a commercial purpose of protecting the long-term operation of the resort, and the bulk of the contract's terms were devoted to that commercial purpose. That includes the provision containing "an offer," which itself was essential for this commercial purpose.

Critical to the resort's continued operation was the renovation and maintenance of the resort facilities. To have sufficient financial incentive to invest in maintaining and renovating the improvements, the operator needed the ability to recover its investment. The ability to make "an offer" to the Government to sell the improvements for fair market value provided an essential financial incentive for a for-profit enterprise to invest in the resort. Indeed, that the operator could make "an offer" for value is the only interpretation that makes sense of why the improvements were not included in the gift of land.

The district court failed to account for any of this. The district court's opinion ignores the material facts presented by EHI that demonstrated that the bulk of the Indenture serves a commercial—and not charitable—purpose, and that the phrase "an offer" is used in one of the purely commercial provisions of the

Indenture.  The district court also did not apply the plain meaning of "an offer," which—under either its meaning as a term of art or its ordinary meaning—unambiguously encompasses a proposed transfer for value.  This Court should reverse the district court's error and order that summary judgment be entered for EHI.

## STATEMENT OF THE CASE

I.    **Facts.**

A.    **JHPI and the Government enter an Indenture to ensure the successful commercial operation of the Caneel Bay Resort.**

In September 1983, the Government and Jackson Hole Preserve, Inc. ("JHPI") entered a contract (the "Indenture") that implemented two different property transactions.  Appx695-700; Appx825 (Engle ¶3).  One transaction was charitable.  JHPI granted to the Government, "by way of gift," approximately 150 acres of bare land located at Caneel Bay, on the island of St. John in the United States Virgin Islands, adjacent to the Virgin Islands National Park.  Appx700; Appx825 (Engle ¶3); Appx1051, Fact 1.

The primary transaction, however, was commercial.  When the Indenture was entered, JHPI and its affiliate had been operating the for-profit Caneel Bay Resort on the land.  In the Indenture, the parties expressly agreed that the resort improvements, including the guest facilities, common facilities, and other infrastructure improvements, would NOT be gifted to the Government, and would

remain the property of Caneel Bay, Inc, the JHPI affiliate that operated the Resort. Appx695.  And the Indenture imposed a Retained Use Estate ("RUE") on the land that gave JHPI the exclusive right to continue the commercial operation of the Resort for forty years.  Appx695-696; Appx1051, Facts 1-2; Appx825 (Engle ¶3). This included the right to operate "guest facilities" "for lodging and meals," with the "sole discretion as to . . . the rates to be charged."  Appx696; Appx1055, Fact 16; Appx825-826 (Engle ¶4).

The terms also recognized that JHPI could sell the resort to a for-profit operator, which would require numerous provisions to assure its successful operation.  The Indenture granted JHPI (and any successor) the right to assign the RUE "to any person," which included any future for-profit purchaser.  Appx697; Appx1057, Fact 20; Appx827 (Engle ¶10).  In eight enumerated paragraphs that comprise the bulk of the Indenture, the parties set forth the commercial terms and contractual obligations of the RUE that assured the profitable operation of the Resort.  Appx696-699; Appx1055, Fact 14; Appx825 (Engle ¶3).

For example, the Indenture recognized that a future operator would likely invest in expansion of the Improvements.  It granted the right to determine the "location … design, and construction" of facilities, and to make "additions, changes, [or] renovations" to the Resort and other facilities.  Appx697; Appx1056, Facts 17-18; Appx826 (Engle ¶5).

6

The future owner of the RUE also had the right to mortgage the RUE. Appx697-698; Appx1058, Fact 22; Appx826-827, ¶¶8-9. The ability to mortgage the RUE was an important commercial provision because it allowed "a buyer [to] obtain mortgage financing for a portion of the purchase price" and to raise capital "for renovations or expansion." Appx1058, Fact 22; Appx826 (Engle ¶8).

The owner of the RUE also had the right to terminate the RUE before its forty-year expiration term. Appx698. And rather than stating that, upon early termination, the Improvements must also be conveyed "by way of gift" to the Government, the Indenture included a put procedure in Paragraph 8. Appx698-699; Appx1058-1059, Facts 24-26. Under the put procedure, the resort operator could terminate the RUE by sending one-year notice of termination that included "an offer" (i.e., the "put") to convey title to the Improvements to the Government. Appx698-699; Appx1058, Fact 24; Appx828 (Engle ¶11). The Government was given six months to consider the offer and advise whether it would accept the offer. Appx699; Appx828 (Engle ¶11). And only "upon acceptance by [the Government], of such offer," would title to the Improvements be conveyed. Appx698; Appx1058, Fact 24; Appx828 (Engle ¶¶11-12). If, however, the Government did not accept the offer, title to the land "shall revert, automatically and without further deed, to Grantor or any successor to Grantor." Appx699; Appx1058, Fact 24; Appx828 (Engle ¶11).

The put procedure served an essential commercial purpose. Appx1058-1059, Facts 24-25; Appx828-829 (Engle ¶¶12-14). It allowed the owner of the Resort "to recover the value of the Improvements in cash, or if the offer were not accepted, by receiving title to the land." Appx1059, Fact 25; Appx828 (Engle ¶12). The ability to be paid for the Improvements provided a resort operator "sufficient financial incentive to construct, renovate, and maintain the Improvements." Appx1059, Fact 26; Appx828 (Engle ¶13). This incentive was important to a resort operator because that operator "needs the ability to recover its large capital investment incurred from purchasing the Improvements, as well as new construction, renovation, and maintenance" of the Resort. Appx1060, Fact 30; Appx829 (Engle ¶14).

Payment for transfer of the Improvements was also consistent with the National Park Service's practice of including in concession contracts for lodging facilities a provision granting "lodging concessioners … the right to payment at the end of the contract for capital improvements." Appx396 (Engle report).

## B. EHI acquires and operates the Resort.

Through a series of assignments, Appellant EHI acquired all of JHPI's right, title, and interest in the 1983 Indenture, including the right to early termination of the RUE and the reversionary interest in the land. Appx1144-1161 (1986 Assignment); Appx785-790 (1991 Assignment); Appx806-812 (2004

Assignment); Appx1052-1054, Facts 6-10; Appx825 (Engle ¶2). EHI and its

affiliate then began operating the Caneel Bay Resort in 2004. Appx825 (Engle ¶2).

Under EHI's stewardship, the Resort contributed each year to the economy

of St. John over $65 million in direct spending and over $160 million in spending

on restaurants, retail stores, nightlife, tours, fishing, and water sports. Appx48

(Complaint ¶18). The Resort was the largest employer on St. John, providing well-

paying jobs for more than 400 employees. Appx48, ¶19. And by supporting many

businesses on the islands, the Resort's guests provided jobs for hundreds more.

Appx48, ¶19. In addition, the Resort consistently promoted local products, artists,

and performers, and donated financial support for community activities. Appx48,

¶20.

EHI also invested more than $70 million on renovation and other capital

expenditures on the Improvements at the Resort. Appx1060, Fact 29; Appx828

(Engle ¶13).

## C.   EHI invokes the put procedure.

In September 2017, Hurricanes Irma and Maria struck the United States

Virgin Islands, forcing closure of the Resort. Appx49 (Complaint ¶24). Before it

could reopen, the Resort needed substantial repair and renovation to incorporate

hurricane-resistant designs, which would require an investment of more than $100

million. Appx49-50 (Complaint ¶¶24-25).

With the RUE set to expire in September 2023, EHI sought to negotiate a long-term lease or extension of the RUE that would allow EHI to rebuild the resort. Appx831-832 (Engle ¶¶21-26). The Government would not agree.

In April 2019, EHI invoked the put procedure and presented an offer to sell the Improvements to the Government for $70 million, which was less than their depreciated fair market value. Appx875-878; Appx1068-1072, Facts 59-74; Appx354-405 (expert reports). In June 2019, the Government advised EHI that it would not accept EHI's offer. Appx901-903; Appx1066, Fact 54. As a result, the land reverted "automatically and without further deed" to EHI. Appx699. The Government, however, refused to recognize EHI's title to the property. Appx51 (Complaint ¶31).

**D.      The importance of the Caneel Bay Resort to the Virgin Islands.**

The Virgin Islands community strongly supports EHI's efforts in this lawsuit to quiet title to the Caneel Bay Resort.

EHI has committed to the Virgin Islands to assign title to the Resort to a charitable trust for the benefit of the people of the Virgin Islands. Appx52 (Complaint ¶37) . EHI has also committed to immediately rebuilding Caneel Bay as a five-star resort, operating under a lease with the trust, which will bring back hundreds of well-paying jobs to the community, and local pride in a world-class, iconic resort. Appx51, ¶33. Through the operation of the Resort, the trust will

provide funds to support education, affordable housing, and protecting the environment for the Virgin Islands. Appx52-53, ¶¶ 37-40.

In contrast, the Park Service does not intend to build a five-star resort; and the more modest hotel option the Park Service is considering may not be completed, if at all, for another ten years or more. Appx654-655 (Plaskett statement). As U.S. House Delegate Stacey Plaskett said, "to not utilize this property as a world-class, five-star resort," or the "continued closure of the Caneel Bay resort will be cataclysmic to the Virgin Islands economy." Appx655. As a result, EHI has gained widespread support for its plans among the Virgin Islands community. Appx497-640 (Kidd decl.); Appx641-650 (Liburd decl.).

## II.     Proceedings.

On June 30, 2022, EHI Acquisitions, LLC filed this lawsuit seeking an order that the Government has no legal interest in the Caneel Bay land, and that EHI owns all right, title, and interest. Appx28.

On March 3, 3023, the United States moved to dismiss, or in the alternative, for summary judgment. Appx31. On June 16, 2023, EHI moved for summary judgment. Appx34.

## III.    Rulings.

On April 22, 2024, the district court granted the Government's motion for summary judgment and denied EHI's motion. Appx40-41. The district court held

that "an offer" in the Indenture required "an offer to convey the improvements free of charge." Appx20. And that meant EHI's offer to convey title to the Improvements for $70 million was "not a valid offer." Appx20.

## SUMMARY OF ARGUMENT

The disputed phrase "an offer" is used in a document that conveys title to property upon "acceptance" of the offer. The document is not a gift deed. It is an "indenture"—a contract that sets out the parties' rights and obligations. The bulk of the Indenture consists of commercial provisions to protect the long-term operation of a for-profit resort using the Improvements. The undisputed facts established that the provision in which the terms "an offer" and "acceptance" are used (paragraph 8) served a purely commercial purpose, by setting up a put procedure to allow the resort operator to recover its investment in the Improvements.

When used in the context of defining contractual rights, "an offer" and "acceptance" are legal terms of art with established meaning. An offer is "a manifestation of willingness to enter into a bargain." Controlling Virgin Islands law requires that this term of art meaning be applied here. The district court refused to apply this meaning.

And when not used as a term of art, the Government conceded, and the district court concluded, that the unambiguous plain meaning of "offer" in this

context is an "act or instance of presenting something for acceptance." The plain meaning unambiguously encompasses both proposed transfers for value and proposed gifts.

Having found the unambiguous plain meaning of the relevant language, controlling Virgin Islands law requires that this meaning be applied and not altered. EHI's offer to the Government for the Improvements clearly fit within the unambiguous meaning of "offer." To propose to transfer property for value *is* "to present something for acceptance or rejection." The district court also failed to apply the phrase's plain ordinary meaning.

Moreover, interpreting paragraph 8 in accordance with its ordinary meaning to permit the resort operator to propose a transfer of the Improvements for value is the only interpretation that makes sense, and explains why the Improvements were expressly carved out, and never included in a gift to the Government.

## ARGUMENT

### I.      Standard of review.

This Court's "standard of review on an appeal from a grant of summary judgment is plenary." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 146 (3d Cir. 1993).

**II.    EHI proffered material facts that were not disputed by the Government and that must be accepted as true for purposes of the motions.**

In opposition to the Government's motion for summary judgment, EHI set forth 89 material facts with supporting evidence.  Appx273-297.  All of EHI's proffered facts and supporting evidence must be accepted as true for purposes of deciding the Government's motion.  *Anglemeyer v. Ammons*, 92 F.4th 184, 188-89 (3d Cir. 2024).

In addition, as required by the district court's Local Rules, EHI's motion for summary judgment was accompanied by a Statement of Material Facts setting forth 83 facts along with supporting evidence for each fact.  Appx661-693.  For the Government to genuinely dispute any of EHI's stated material facts, it would not suffice for the Government to simply assert a fact was disputed.  Federal Rule 56(c) requires a party to support each such assertion by "citing to particular parts of materials in the record," such as documents, affidavits, or depositions.  Fed. R. Civ. P 56(c)(1)(A).  The Local Rules of the district court required the same.  LRCi 56.1.  "Denials in the form of legal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."  *SEC v. Bonastia*, 614 F.2d 908, 914 (3d Cir. 1980).

Nor would it suffice for the Government to simply rely on arguments of counsel, because such arguments "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion."  *Jersey*

*Cent. Power & Light Co. v. Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

"Actual evidence is required," and "bare assertions … will not suffice." *Todd v. Blake*, No. 3:17-cv-0012, 2023 U.S. Dist. LEXIS 52715, at *6 (D.V.I. Mar. 28, 2023) (internal citations omitted).

If a party fails to respond to an asserted material fact by disputing it with evidence, the court may deem the fact "undisputed for purposes of the motion." Fed. R. Civ. P. Rule 56(e)(2); *RLF Nazareth, LLC v. York RSG (Int'l), Ltd.*, No. 3:19-cv-0071, 2023 U.S. Dist. LEXIS 119639, at *8 (D.V.I. July 12, 2023).

In response to EHI's 83 proffered material facts, the Government failed to dispute 78 of them with any evidence. Appx1051-1074. Each of these facts should be deemed undisputed for purposes of both parties' motions. As discussed below, some of these facts are material to the interpretation of the Indenture. And the undisputed facts are sufficient to compel summary judgment in favor of EHI.

## III. The objective intent of the parties was that EHI could propose to convey the Improvements for value.

### A. The objective intent of the parties is found in the plain meaning of the words in context as established by objective sources (such as dictionaries).

To interpret a contract, the Court applies "the forum's contract interpretation law." *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020). Here, Virgin Islands law governs.

"A deed is a contract, and thus in most circumstances the principles of

contract interpretation govern." *Streibich v. Underwood*, 74 V.I. 488, 502 (2021).

And an "indenture" is itself a type of contract—a deed in which the parties "enter

into reciprocal and corresponding grants or obligations towards each other."

Black's Law Dictionary 692 (5th ed. 1979); *Lorenz v. CSX Corp.*, 1 F.3d 1406,

1415 (3d Cir. 1993) ("An indenture is, of course, a contract.").

The "primary purpose" of contract interpretation "is to ascertain and give

effect to the parties' objective intent." *Phillip v. Marsh-Monsanto*, 66 V.I. 612,

624-25 (2017). "[C]ourts must eschew the ideal of ascertaining the parties'

subjective intent and instead bind parties by the objective manifestations of their

intent." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75-76 (3d Cir.

2011) (internal quote omitted).

"Objective intent" refers to "what the contract's words would mean in the

mouth of a normal speaker of English, using them in circumstances in which they

are used." *Phillip*, 66 V.I. at 624–25 (internal quote omitted); *Buono Sales, Inc. v.

Chrysler Motors Corp.*, 449 F.2d 715, 721 (3d Cir. 1971) ("the wording of a

contract is to be given its plain and ordinary meaning").

The parties' intent, therefore, is found in the meaning of the words they

selected to define their rights and obligations. "The Court will not rewrite the

contract or give it a construction that conflicts with the plain, ordinary, and

accepted meaning of the words used." *Arvidson v. Buchar*, 72 V.I. 638, 651

(Super. Ct. 2020) (cleaned up).

To find the ordinary meaning, the Court "consider(s) the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Mellon Bank, N.A. v. Aetna Bus. Credit*, *Inc.*, 619 F.2d 1001, 1011 (3d Cir. 1980). The primary "objective evidence" of ordinary meaning is dictionaries "because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract.'" *Aleynikov v. Goldman Sachs Grp., Inc.*, 765 F.3d 350, 360 (3d Cir. 2014). Unless a word is used as a term of art, "words will be given their common, 'dictionary,' meaning." *Ubiles v. People of the V.I.*, 66 V.I. 572, 574 (2017).

But to know which definition among many within a dictionary to select (and even which dictionary to consult), a court must first determine the context in which a word is used, because "[w]ords and phrases shall be read with their context." 1 V.I. Code § 42; *Defoe v. Phillip*, 56 V.I. 109, 121 (2012). A court must interpret the words "according to their plain meaning within the context of the document as a whole." *Weary v. Long Reef Condo. Ass'n*, 57 V.I. 163, 170 (2012).

We first turn to the context in which "offer" appears.

**B.** **The phrase "an offer" appears in a commercial context in the Indenture.**

The first contextual clue to the meaning of "offer" is straightforward: "offer" is preceded by "an" and therefore is used as a noun.  The Indenture does not read, for example, "Such notice of termination shall offer to convey title to the Improvements."  Instead, the rights holder must submit "an offer."  Accordingly, noun definitions rather than verb definitions of "offer" should be considered.

The two key aspects of context here are: (1) the Indenture as a whole is a commercial contract instrument, not a deed of gift, (2) the "an offer" provision appears in the commercial provisions in paragraph 8 and served a commercial purpose.  Each is demonstrated in turn below.

**1.** **The 1983 indenture was a commercial contract instrument, not a deed of gift.**

The district court concluded that "the context of the whole Indenture" established that the meaning of offer "was entirely philanthropic."  Appx10.  To reach this conclusion, the district court entirely ignored the bulk of the Indenture, as well as the undisputed facts establishing its commercial, not philanthropic, purpose.

If the purpose had been "entirely philanthropic" as the district court concluded, the parties would have proceeded by using a different instrument, a "deed of gift."  *De Jesus v. David*, 25 V.I. 80, 82 (Terr. Ct. 1990) ("Deed of Gift"

meant conveyance was a gift); *George v. Lindesay*, 22 V.I. 42, 44 (Terr. Ct. 1986); *McIntosh v. Prince*, 9 V.I. 3, 5 (Mun. Ct. 1971).

But the parties did not use a deed of gift. They used an Indenture, which, as noted above, is a type of contract that imposes obligations on both sides. A portion of the Indenture does recite a conveyance of land to the Government and declares that "[t]his conveyance is by way of gift." Appx700. But this "gift" language applies to the land and not the Improvements. As the district court itself expressly acknowledged, the phrase "'[t]his conveyance' refers to the 1983 transfer of the land—not the future transfer of the improvements." Appx11. The parties expressly agreed that the Improvements were excluded from the gift. Appx695 ("exclusive of all other improvements thereon").

Consistent with the use of an indenture rather than a deed of gift, the bulk of the Indenture is not philanthropic at all. Instead, it serves an entirely commercial purpose in protecting the long-term operation of a for-profit resort using the Improvements. Appx1055-1059. The Indenture defines the parties' respective rights and obligations for an RUE in eight numbered paragraphs across four pages. Appx696-699. The plain language of these provisions demonstrated that they served a commercial purpose. In addition, the material facts set forth by EHI on this issue were undisputed. Appx1055-1061.

For example, Paragraph 3 of the Indenture granted the owner of the RUE the

right to operate "guest facilities," including "facilities for lodging and meals and other facilities and services," with "sole discretion as to … the rates to be charged." Appx696. This provided the "freedom to operate all of the facilities needed for a successful high-end resort." Appx666, Fact 16; Appx825, ¶4.

Paragraph 4 of the Indenture granted the owner of the RUE the "sole discretion" to make "additions, changes, renovations, and alterations" to the Improvements. Appx697. These provisions "provide[d] the resort operator the ability to renovate existing structures and to build and add new ones." Appx1056, Fact 18; Appx826, ¶5.

Paragraph 6 of the Indenture granted the RUE owner the right to "assign and transfer the Retained Use Estate to any person." Appx697. It was undisputed that this provision "was essential for the commercial operation of the Resort" because a future owner of the Resort that "invests substantial money in a commercial operation needs the flexibility to exit the investment by selling their position." Appx1057-1058, Facts 20-21; Appx827, ¶10.

Paragraph 6 also granted the RUE owner the right to mortgage the RUE. Appx1058, Fact 22. "This was an essential term to allow the resort operator to sell the resort operation" (as JHPI did just three years later in 1986) "so a buyer could obtain mortgage financing for a portion of the purchase price" and to raise capital "for renovations and expansion." Appx826-827, ¶8.

The district court never acknowledged that the bulk of the Indenture was a commercial transaction, with four pages of provisions that served a commercial purpose. This undermines the district court's conclusion that the Indenture was entirely philanthropic, which was the fundamental basis for the district court's erroneous interpretation of "an offer."

Moreover, if these provisions were ambiguous as to whether they served a commercial versus a philanthropic purpose, then that becomes an issue of fact. "If the court determines that a given term in a contract is ambiguous, then the interpretation of that term is a question of fact." *Stendardo v. Fed. Nat'l Mortg. Ass'n*, 991 F.2d 1089, 1094 (3d Cir. 1993). EHI submitted facts below, supported by unrebutted evidence, demonstrating the commercial purpose of these provisions. Appx1055-1059. These facts must be accepted as true for purposes of summary judgment. By "fail[ing] to construe the evidence in favor of … plaintiff," the district court committed reversible error. *Anglemeyer v. Ammons*, 92 F.4th 184, 189 (3d Cir. 2024).

### 2. The "an offer" provision in paragraph 8 served a commercial purpose.

The "an offer" phrase is found in paragraph 8, within the commercial provisions, showing that the parties intended it to further the commercial success of the Resort. And it was undisputed below that the ability to transfer the Improvements for value served "an essential function for the successful

commercial operation of the resort." Appx1059, Fact 25; Appx828, ¶12.

The parties to the Indenture not only agreed that JHPI would operate the RUE and Improvements as a commercial resort, they expressly agreed that JHPI had the right to sell (i.e. not gift) the resort to a for-profit company. Appx697-698. Both parties also agreed that, if such a sale occurred, the new owner could invest substantial sums expanding the Improvements (Appx697, ¶4), and, in all events, would have to invest large sums to periodically renovate and maintain the Improvements. Appx696-697, ¶¶2, 4.

As common sense dictates, and as the undisputed facts established, a "resort operator needs the ability to recover its large capital investment incurred from purchasing the Improvements, as well new construction, renovation, and maintenance of the Improvements." Appx1058-1059, Facts 24-26; Appx829, ¶14. And for the resort to succeed, the resort operator needed "sufficient financial incentive to construct, renovate, and maintain the Improvements," particularly as the RUE neared expiration. Appx1058-1059, Facts 24-26; Appx828-829, ¶¶11-14.

Accordingly, both parties agreed that the Indenture would be *structured so that the Improvements would not be included in the gift to the Government*. They expressly agreed that the conveyance of land by gift was "exclusive of" the Improvements. Appx695.

Instead, the parties agreed in paragraph 8 (one of the commercial provisions)

22

to a put procedure through which the resort operator could sell the Improvements to the Government.  Appx698-699; Appx1058-1059, Fact 24; Appx828, ¶¶11-12. This was consistent with the National Park Service's practice of including in its concession contracts for lodging facilities a provision granting "lodging concessioners … the right to payment at the end of the contract for capital improvements."  Appx396.  This "assures that a commercial operation can operate successfully by receiving fair market compensation for resort buildings that it has purchased or constructed, and then renovated and maintained for decades." Appx1058-1059, Facts 24-26; Appx829, ¶14.

The district court never mentioned any of the undisputed facts establishing that paragraph 8 served a commercial, not philanthropic, purpose.  There is no sign that the district court even considered these facts, much less accepted them as true, as the court was required to do.  This was error.  *Anglemeyer*, 92 F.4th at 189.

**C.  The plain meaning of "an offer" encompasses a proposed transfer for value.**

Terms of art "shall be construed and understood according to their peculiar and appropriate meaning."  *Defoe v. Phillip*, 56 V.I. 109, 121 (2012) (quoting 1 V.I.C. § 42).  All "other words will be given their common, 'dictionary,' meaning."  *Ubiles v. People of the V.I.*, 66 V.I. 572, 590 (2017).

**1. The phrase "an offer" is used in the Indenture as a term of art meaning a proposed exchange for value.**

A "term of art" is "a word or phrase having a specific, precise meaning in a given specialty, apart from its general meaning in ordinary contexts." Black's Law Dictionary 1610 (9th ed. 2009). A word becomes a term of art as the result of consistent usage and widespread adoption in a field. After widespread adoption, a term of art's definition may be found in specialty dictionaries or treatises in the field.

When used in the context of defining agreed rights and obligations, i.e. the field of contracts, the terms "an offer" and "acceptance" are terms of art, as demonstrated by widespread and consistent usage over many decades. *Trading Techs. Int'l v. Ibg Llc*, No. 10 C 715, 2020 U.S. Dist. LEXIS 259896, at *14 (N.D. Ill. Oct. 21, 2020) ("the term 'offer' is a term of art in contract law"); *Zinner v. Olenych*, 108 F. Supp. 3d 369, 390 n.7 (E.D. Va. 2015) ("offer is a term of art").

The Virgin Islands uses "offer" and "acceptance" as terms of art. *Peppertree Terrace v. Williams*, 52 V.I. 225, 241 (V.I. 2009) ("It is well settled that an enforceable contract requires an offer and acceptance.") (Justice Swan, concurring); *SBP v. Family Props. Caribbean*, No. ST-2010-CV-00357, 2011 V.I. LEXIS 161, at *6 (V.I. Super. Apr. 8, 2011). Virgin Islands courts couple "offer" with "acceptance" and define "offer" as "the manifestation of willingness to enter into a bargain," i.e. an exchange for value. For example: "An offer is the

manifestation of willingness to enter into a bargain and assent is completed only upon acceptance of the offer by the offeree." *Roy v. Banco Popular de P.R.*, No. ST-2014-CV-00306, 2017 V.I. LEXIS 185, at *7 (V.I. Super. Mar. 28, 2017) (citation omitted); *Isidor Paiewonsky Assocs. v. Sharp Props.*, 761 F. Supp. 1231, 1233 (D.V.I. 1991) (same); *SBP*, 2011 V.I. LEXIS 161, at *6 (same).

In fact, the terms "offer" and "acceptance" are such deeply entrenched terms of art, they have been adopted by every jurisdiction in this country. EHI demonstrated this in its briefs below with citations to dozens of cases. Appx475-476 (citing cases from all 50 states, as well as Guam and federal common law). And the terms "offer" and "acceptance" are found alongside their special definitions in the applicable dictionaries and treatises. Black's Law Dictionary 976 (5th ed. 1979) (defining "offer"); *id*, at 12 (defining "acceptance"); Restatement (Second) of Contracts, § 24 (1981) (defining "offer"); *id.* at § 52 (defining "acceptance").

The conclusion that "an offer" is used as a term of art in paragraph 8 is reinforced by examining the specific sentence where it appears: "an offer by Grantor to convey and transfer … fee title in and to all improvements." Appx698. The sentence is chock-full of well-known legal terms of art, including "convey," "transfer," "fee," title," and "improvements." Appx698. In this company, it would be highly anomalous for the parties to have used the well-known terms of art

"offer" and "acceptance" if they did not intend those words to be understood as terms of art.

Moreover, when "an offer" is used in the phrases "an offer to convey" title or "an offer to transfer" title, it virtually always has its meaning as a term of art, i.e. a proposal to convey or transfer property for consideration. EHI demonstrated this fact below with citations to hundreds of cases. Appx1100-1102, n.1 ("offer to convey"); Appx1102-1103 n.2 ("offer to transfer"). The Virgin Islands and every other jurisdiction uses the phrases "an offer to convey" title and "an offer to transfer" title to mean a manifestation of a willingness to enter into a bargain to deliver title. *Id.* No jurisdiction uses these phrases to mean exclusively a gift of property.

There can be no serious debate that in the context of reciting agreed rights and obligations, the phrase "an offer" to convey title is a term of art with an established meaning, especially when coupled with a required "acceptance … of such offer."

But the district court refused to acknowledge that "an offer" requiring "acceptance" was a term of art. And the district court declined to mention, much less grapple with, all of the evidence recited above establishing this fact.

Instead, the district court's sole basis for rejecting this mountain of evidence was "EHIA cites no precedential authority—and this Court can find none—

holding that 'offer' is a term of art." Appx14-15. That was error. The absence of "precedential authority" does not imply that a word or phrase is not a legal term of art. The most well-established terms of art are the least controversial, and therefore the least likely to have their status as terms of art debated and then explicitly declared in a precedential holding.

A word or phrase does not become a term of art because "precedential authority" declares it so. It becomes a term of art when it is consistently used and understood in a field to have a specialized meaning, as shown by (i) evidence of wide-spread usage over a significant period of time, or (ii) formal presentation as a term of art in a specialized dictionary or treatise. Both of these are true for "offer" and "acceptance."

Moreover, although these opinions are not "precedential" because they are not binding on the district court or this Court, courts have expressly held that "offer" is a term of art. *See Trading Techs. Int'l v. Ibg Llc*, 2020 U.S. Dist. LEXIS 259896, at *14 (N.D. Ill. Oct. 21, 2020) ("the term 'offer' is a term of art in contract law"); *Zinner v. Olenych*, 108 F. Supp. 3d 369, 390 n.7 (E.D. Va. 2015) ("offer is a term of art").

Controlling Virgin Islands law mandates that terms of art be construed to have their specialized meaning. "Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, <u>shall be</u>

27

construed and understood according to their peculiar and appropriate meaning."
*Defoe v. Phillip*, 56 V.I. 109, 121 (2012) (quoting 1 V.I.C. § 42, emphasis added).

The "persuasive," "renowned," and "definitive" sources for the meaning of legal terms concerning contractual rights are Black's Law Dictionary and the Restatement (Second) of Contracts. [1] The applicable edition of Black's at the time of the Indenture defined "offer," when used as a noun, as follows:

> "A proposal to do a thing or pay an amount, usually accompanied by an expected acceptance, counter-offer, return promise or act. <u>A manifestation of willingness to enter into a bargain</u>, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."

Black's Law Dictionary 976 (5th ed. 1979) (emphasis added).

The 1981 version of the Restatement (Second) of Contracts also defined an offer as "a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981). And Virgin Islands courts have consistently adopted this definition. *Roy v. Banco Popular de P.R.*, No. ST-2014-CV-00306, 2017 V.I. LEXIS 185 at *7 (V.I. Super. Mar. 28,

---

[1] *United States v. Dawson*, 32 F.4th 254, 262 (3d Cir. 2022); *Hepp v. Facebook*, 14 F.4th 204, 213 (3d Cir. 2021); *Addie v. Kjaer*, 737 F.3d 854, 861 (3d Cir. 2013).

2017); *SBP v. Family Props. Caribbean*, No. ST-2010-CV-00357, 2011 V.I. LEXIS 161, at *6 (V.I. Super. Apr. 8, 2011); *Isidor Paiewonsky Assocs. v. Sharp Props.*, 761 F. Supp. 1231, 1233 (D.V.I. 1991).

### 2. The non-legal ordinary meaning of "an offer" also encompasses a proposed transfer for value."

Unless a word has a specialized meaning as a term of art, "words will be given their common, 'dictionary,' meaning." *Ubiles v. People of the V.I.*, 66 V.I. 572, 574 (2017). When "an offer" is not used in the context of a commercial contract coupled with a required "acceptance," the common dictionary meaning of the noun "offer" unambiguously encompasses both proposed transfers for value and proposed gifts.

The non-legal ordinary meaning of the noun "offer" is an "act or instance of presenting something for acceptance."

- "an act of offering: as a : a presenting for acceptance." Webster's Third New International Dictionary Unabridged 1566 (2002).

- "Something, such as a suggestion, proposal, bid, or recommendation, that is offered" where the verb "offer" means "To present for acceptance or rejection." American Heritage Dict. of the English Language 1220 (4th ed. 2000).

- "an act or instance of offering" where "offer" as a verb means "to present for acceptance or rejection." "Offer is a common word in general use for

presenting something to be accepted or rejected." Random House Webster's Unabridged Dictionary 1344 (2nd ed. 2001).

- "an act of offering: as a : a presenting for acceptance." Cambridge Dictionary of American English 594 (2d ed. 2007).

- "a presenting of something for acceptance." Merriam-Webster's Collegiate Dictionary 861 (11th ed. 2009).

The Government presented no source asserting that the ordinary meaning of "an offer" mandated a gift and precluded a proposed transfer for value. In fact, the Government conceded that the "Government has never argued that the definition of 'offer' mandates a gift." Appx1002. Instead, the only definition the Government ever suggested was an alternative definition from the Seventh Edition of Black's (1999): "The act or instance of presenting something for acceptance." Appx416. The Government asserted this "definition is plain and unambiguous." Appx416.

Likewise, the district court concluded "offer" unambiguously means "to present for acceptance of rejection." Appx14. The district court first consulted three dictionaries. Appx9-10. Each definition quoted by the district court encompassed a proposed transfer for value. Appx9-10. None restricted the term's meaning to exclusively a proposed gift. The district court then examined "the context of the whole Indenture," Appx10-11, "the surrounding provisions of the Indenture," Appx11-12, and EHI's arguments in support of its proposed meaning.

Appx12-13. After this full analysis, the district court agreed that the plain meaning of "offer" in the context of the Indenture of a whole was consistent with the dictionary definitions it quoted. The district court held: "we conclude that 'offer' unambiguously means 'to present for acceptance or rejection.'" [2] Appx14.

Thus, both parties agreed, and the district court held, that the non-legal ordinary meaning of "an offer" was unambiguous, and that it meant an "act or instance of presenting something for acceptance."

### 3. The district court erroneously failed to apply the unambiguous meaning.

Once the district court found the unambiguous plain meaning of the words, controlling law required that it "follow their plain meaning and abstain from imputing language or interpretations that are not in accordance with their plain meaning." *Weary v. Long Reef Condo. Ass'n*, 57 V.I. 163, 169-70 (V.I. 2012); *Pac. Emplrs. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) ("If we determine that the language is unambiguous, we follow its plain meaning").

"Objective intent" refers to "what the contract's words would mean in the mouth of a normal speaker of English, using them in circumstances in which they

---

[2] The district court adopted the verb form, rather than the noun form identified by the Government ("[t]he act or instance of presenting something for acceptance"). Appx416. The Indenture uses the noun form.

are used." *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 624–25 (V.I. 2017) (internal quote omitted). The parties' "objective intent" is found in the ordinary meaning of the words they selected and agreed to use to define their rights and obligations. As shown above, the Government admitted, and the district court concluded, that (i) the ordinary meaning of "an offer" was an "act or instance of presenting something for acceptance," and (ii) this meaning was "unambiguous." This unambiguous plain meaning represents the "objective intent" of the parties.

This ordinary meaning of "an offer" does not mandate that the thing presented must be for free. For example, the district court quoted the definition of "offer" from Merriam-Webster's online dictionary: "to present for acceptance or rejection." https://www.merriam- webster.com/dictionary/offer (last visited Sept. 14, 2024). That dictionary entry continues with this example: "was *offered* a job." A job offer is not a proposal to work for free or to be paid for doing nothing. A job offer is a proposed exchange for value.

As another example, the definition quoted by the Government from Black's Seventh Edition, "act or instance of presenting something for acceptance," continues with this illustration: "the prosecutor's offer of immunity." Blacks' Law Dictionary 1111 (7th ed. 1999)). A prosecutor does not offer immunity as a gift, for free; immunity requires something in return, such as information and honest testimony.

EHI's offer clearly fits within the unambiguous meaning of "offer." To propose to transfer property for value *is* "to present something for acceptance or rejection." For EHI to prevail does not require that the phrase "an offer … to convey and transfer" means *exclusively* a proposed transfer for value. EHI prevails if the phrase means a proposed transfer for value or for free (if it encompasses both bargain and gift). By contrast, the Government prevails only if the phrase *precludes* a transfer for value (if it means exclusively gift).

If the district court had applied the unambiguous meaning of "an offer"—either as a term of art, or in ordinary language—it was compelled to conclude that the proposal from EHI was "an offer."

The district court refused to do so. Instead, the district court—without further explanation—declared that "an offer" required "an offer to convey the improvements free of charge." Appx20. But that "an offer" *can* encompass a proposed transfer "free of charge" does not provide a basis for concluding that it means exclusively "free of charge" and precludes a proposed bargain.

If the unambiguous meaning of "an offer to convey" property encompasses both "a proposed gift" and "a proposed exchange for value," that demonstrates that it was the parties' objective intent (as shown by the words they selected) that a proposal under Paragraph 8 could be either one. That a phrase means "A or B"

does not make it ambiguous.  It unambiguously encompasses both A and B.  *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001).

To restrict the unambiguous phrase "an offer" so that it precludes an exchange for value requires the insertion of additional words.  The limitation "free of charge" added by the district court is not part of the unambiguous plain meaning of the words.  It was legal error for the district court to "rewrite the contract" and apply "a construction that conflicts with the plain, ordinary, and accepted meaning of the words used."  *Arvidson v. Buchar*, 72 V.I. 638, 651 (Super. Ct. 2020) (internal quote omitted).  "Where the language of a contract is clear and unambiguous, the parties' intent must be derived from the plain meaning of its terms."  *Cruz v. St. Croix Fin. Ctr., Inc.*, No. 2019-0060, 2024 V.I. Supreme LEXIS 11, 12 (V.I. Feb. 9, 2024) (internal quote omitted).

### D.    EHI's interpretation of "an offer" is the only interpretation that makes sense of the Improvements.

"Any . . . reading which renders contract provisions pointless, superfluous, or ineffective violates basic notions of contract interpretation, and leads to an absurd result which should not be entertained."  *Id*. at 12 (internal quote omitted).  Only EHI's interpretation makes sense of the four fundamental tenets the parties agreed to for the Improvements:

(1) The Improvements were not gifted to the Government.

Instead, the Improvements were expressly excluded from the gift.

(2) The Indenture does not require that, upon expiration of the RUE, the Improvements would be transferred to the Government.

(3) Upon early termination, a rejection of the resort operator's offer for the Improvements automatically results in transferring the land from the Government to the resort operator.

(4) Upon early termination, the Improvements are treated very differently than they are upon expiration of the RUE.

With EHI's interpretation, all of these provisions are consistent and make perfect sense. The resort operator owns the Improvements, can invest in renovating or adding to them, and retains the unrestricted right to sell them for value. And because "an offer" encompasses a proposed transfer for value, paragraph 8 serves as a put procedure that allows the resort operator to recover its investment in the Improvements.

But under the Government's interpretation—the parties intended a mandatory gift of the Improvements to the Government—none of these provisions make sense.

*First*, if the parties had agreed that both the land and Improvements would be gifted to the Government, there was no reason not to include the Improvements in the initial conveyance, and make them subject to the RUE, just like the land. Neither the Government nor the district court ever offered any plausible

explanation for excluding the Improvements from the gift.

*Second*, if the parties had intended a mandatory gift of the Improvements to the Government, they certainly would have included a provision requiring that the Improvements be transferred to the Government upon expiration of the RUE. But there is no such provision. Under the terms of the Indenture, if the RUE expires, the Improvements remain in the hands of an affiliate of JHPI or its successor. The owner of the Improvements retains full dominion to (i) gift them to the Government, (ii) retain them, or (iii) sell them for value.

*Third*, if the parties had intended that, in all events, the Resort will wind up as part of the National Park, it makes no sense to include in paragraph 8 an automatic reversion of the land if the Government rejects an offer of the Improvements. The explanation offered by the district court for this inconsistency is that the parties wanted to assure that, when the RUE ends, "the land and improvements wind up in a single set of hands." Appx12. But that is false, because the parties agreed that upon expiration of the RUE the land and improvements could remain in different hands.

The Indenture itself did not mandate that, upon expiration of the RUE, the Improvements would be transferred to the Government. Thus, if JHPI held on to the RUE, and entered no further deeds with the Government, upon expiration of the RUE the Improvements and land would continue to be owned by different

parties.

And when JHPI sold the RUE and Improvements, JHPI included an express provision in the assignment confirming that, upon expiration of the RUE, the land and Improvements could wind-up in different hands. In the 1986 assignment to Rockresorts, JHPI inserted the obligation that Rockresorts must "convey and transfer fee title in and to the Improvements on the Premises on or about the date of expiration of the Retained Use Estate … to the USA by deed." Appx772. But this 1986 assignment included the proviso that this obligation would not apply if Rockresorts implemented paragraph 8: Rockresorts "shall have no obligation to convey and transfer to USA fee title to such Improvements … if prior to the Retained Use Estate Expiration Date, fee title to a portion of the Premises shall have reverted to Grantee [Rockresorts]." Appx772.

And most significantly, the 1986 assignment further provided that if Rockresorts did not invoke paragraph 8, and upon expiration of the RUE the "National Park Service shall have advised Grantee [Rock Resorts]" that it is "unwilling to accept conveyance" of the Improvements, then the Improvements are NOT transferred to the Government. Appx772. And that provision contains no mandatory reversion of the land. In that circumstance, the Government does not get the Improvements, there is no automatic reversion of the land, and ownership of the land and the Improvements continue in separate hands.

Because the agreed structure includes multiple scenarios where the land and Improvements wind up in separate hands, it is simply not true that the parties included provisions for the purposes of assuring that the land and Improvements would always wind up in the same hands. Thus, the district court's proffered explanation for automatic reversion of the land fails. Only EHI's interpretation makes sense of that provision.

*Fourth*, if the parties had intended that JHPI must gift the Improvements and that paragraph 8 was not a put procedure, there would be no reason for treating the Improvements differently upon early termination as compared to upon expiration of the RUE. But under the actual provisions the parties agreed to (i.e. their objective intent) early termination and expiration look nothing alike. With early termination, the resort operator submits "an offer" requiring an "acceptance," followed by a six-month period for the Government to consider the offer, with the threat of reversion if the Government failed to accept the offer.

But if the resort operator elects not to proceed with early termination and the RUE proceeds to expiration, none of that takes place. There is no "offer," and no six-month period for "acceptance of such offer." Instead, if the "National Park Service shall have advised Grantee [Rock Resorts]" that it is "unwilling to accept conveyance" of the Improvements, then the Improvements are NOT transferred to the Government. Appx772. And if that happens, there is no automatic reversion

of the land, and ownership of the land and the Improvements continue in separate hands.

Only EHI's interpretation, which applies the ordinary meaning of the words in context, makes sense of these provisions.

## III. The district court's reasoning does not support its failure to apply the objective intent of the parties.

The district court asserted six reasons for concluding that "an offer" should be construed—contrary to either its term-of-art or ordinary meaning—to require a proposed gift of the Improvements, and to preclude a proposed transfer for value. Each of these reasons was erroneous—based on a false premise, circular reasoning, or both.

### A. The district court erroneously concluded that because paragraph 8 does not say "an offer to convey for value" it cannot encompass a proposal to convey "for value."

The district court reasoned: "Paragraph 8, by its terms, says only that a termination notice shall be accompanied by 'an offer . . . to convey and transfer' title to the improvements," and "does not say that the Grantor shall make 'an offer to convey for value' or 'an offer to sell.'" Appx10. The district court then invoked the maxim: "When parties use clear and unambiguous terms, we will not insert additional terms that are contrary to the parties' plain meaning." *Id.* And it concluded "the plain language of Paragraph 8 indicates that the parties did not intend to make the improvements' transfer contingent on payment." *Id.*

This is circular reasoning because it assumes the truth of its conclusion: that the plain meaning of "an offer" is limited to "a gift" and does not encompass a proposed transfer for value. If that premise were true, then "an offer" could encompass a proposed exchange for value only by inserting additional words. But circular reasoning that depends on the truth of its conclusion to prove its conclusion is fallacious.

Moreover, the district court's assumed premise is false. The plain meaning of "an offer" is <u>not</u> exclusively a gift. In context, "an offer" is coupled with a required "acceptance" and used as a term of art that means a proposed exchange for value. There is no need to insert "for value" because the words "an offer" already unambiguously include that concept. And even when "an offer" is not used in the context of a commercial contract coupled with a required "acceptance," the ordinary meaning of "offer" unambiguously encompasses both proposed transfers for value and proposed gifts.

In reaching its conclusion, the district court itself violated the maxim "[w]hen parties use clear and unambiguous terms, we will not insert additional terms that are contrary to the parties' plain meaning." Appx10. The court construed the phrase "an offer … to convey and transfer … all improvements" to mean "an offer to convey the improvements <u>for free</u>." Appx20 (emphasis added). By inserting the additional words "for free"—a limitation not found in the plain

meaning of the words—the district court violated the maxim.

In fact, to state its conclusion, the district court was *compelled* to spell out "for free" precisely because the ordinary meaning of "an offer to convey the improvements" encompasses a proposal to transfer for value and does not mandate a gift.

Worse still, the district court's conclusion violates controlling Virgin Islands law that imposes the exact opposite presumption, i.e. it precludes interpreting language as a gift, absent express and unambiguous gift language. "To substantiate donative intent, the donee must demonstrate a clear, unmistakable, and unequivocal intention of the part of a donor to make a gift of his or her property." *Drayton v. Drayton*, 65 V.I. 325, 343-44 (V.I. 2016) (internal quotes omitted); *Chestnut v. Goodman*, 59 V.I. 467, 473-74 (V.I. 2013).

For the parties to effectuate a gift of the Improvements upon early termination, that intent had to be clearly, unmistakably, and unequivocally stated. The required intent is NOT donative intent for something merely related to the Improvements (such as an intent to donate the land), it must be for the Improvements themselves. And the required intent is NOT for a gift of the Improvements at the end of the RUE's term. It must be donative intent for a transfer under the circumstances of paragraph 8, i.e., upon the resort operator's early termination of the RUE with automatic reversion of the land if the offer is

rejected.

To clearly demonstrate donative intent, the early termination provision would need to read "shall include a proposal to convey and transfer title to the Improvements to Grantee by way of gift," or "without consideration," or something of the sort. The lack of any such words precludes finding a "clear, unmistakable and unequivocal intention … to make a gift" as required by controlling law. *Drayton*, 65 V.I. at 343-44.

The Government never grappled with this law below. Nor did the district court address it. The lack of clear, unmistakable, and unequivocal words of donative intent in paragraph 8 precludes an interpretation of donative intent as a matter of controlling Virgin Islands law.

### B. The district court erroneously reasoned that requiring payment for improvements is inconsistent with giving the land for free.

The district court reasoned:

"[T]he Indenture's conclusion explicitly states that '[t]his conveyance is by way of gift, without consideration except the nominal consideration hereinabove recited.' 1983 Indenture at 6. While '[t]his conveyance' refers to the 1983 transfer of the land—not the future transfer of the improvements—the statement nonetheless shows that 'offer' means 'offer as a gift' concerning the improvements as well. Why? Because the Indenture's reversion

42

> clause ties the land and improvements together. To keep the land, the
>
> Government would have to accept the offer of the improvements. But
>
> if that offer were conditioned on payment, then the Government's
>
> retention of the land, in effect, also would be conditioned on payment
>
> beyond the stated consideration of one dollar—meaning it would no
>
> longer be a gift."

Appx11. Only by assuming the truth of the court's conclusion—assuming that "an offer" means "proposed gift"—is there any inconsistency in requiring payment for the Improvements while giving the land for free.

But if the parties meant exactly what they wrote—that upon early termination the resort operator could submit "an offer" requiring "acceptance" i.e. a proposed transfer of the Improvements for value—there is no inconsistency. The parties agreed the Government would pay nothing for the land but would not get the Improvements, that JHPI might or might not later gift the Improvements, and, under specified circumstances, the Government would have to pay for the Improvements or have the land revert back. There is nothing internally inconsistent about such an agreement.

This is no more inconsistent than the traditional "buy one, get one free" deal. Do courts declare that a buy-one-get-one-free contract makes no sense because it is "inconsistent with the intent to gift one item," and therefore the buyer gets to walk

away with the free item (or with both items) and pay nothing?  Of course not.

If we adopt the correct starting premise, the Indenture makes perfect sense, and it is the district court's conclusion that is contrary to the parties' express intention.  The parties expressly agreed, in unambiguous terms, that if the Government did not accept the proposed transfer of the Improvements for value, the resort operator would keep the Improvements, and the land would "revert, automatically, and without further deed" to the resort operator.  Appx699.  In the words of the district court, "the Government's retention of the land … would be contrary to the parties' stated intention, which we are bound to honor."  Appx11.

Nor does requiring payment for the Improvements in any way diminish the value of the land gift.  If the Government were to pay full market value for the Improvements, the Government would still have paid nothing at all for the land— i.e. the benefit to the Government would still be the full value of the land.  An equivalent transaction would be if a party offered to deed the Government a valuable commercial resort with improvements and 150 acres of prime real estate that had a mortgage on it in an amount equal to the value of the improvements, conditioned upon the Government assuming the mortgage.  Even with the required mortgage assumption, this transaction still constitutes a gift equal to the value of the land.

## C. The district court erroneously relied on paragraph 2.

As already mentioned, the district court acknowledged that the only "gift" language in the Indenture—"[t]his conveyance is by way of gift"—"refers to the 1983 transfer of the land—not the future transfer of the improvements." Appx11. Instead, the district court repeatedly cited to a sentence in paragraph 2 of the Indenture, and concluded that the sentence "could not be clearer" that the parties "desired the Caneel Bay Resort to become part of the Virgin Islands National Park 'for the public benefit.'" Appx11-12.

> The district court purported to quote Paragraph 2 as follows:
>
> "[A]t some future time . . . the Retained Use Estate will be terminated and extinguished in order to carry out the longstanding objective of Grantor that the [Resort] ultimately be an integral part of the Virgin Islands National Park. . . ."

Appx11 (quoting Indenture at 3) (additions and ellipses added by district court).

Nothing in this language as quoted actually suggests that the Improvements will be gifted to the Government. But what is worse, this quote alters the text of paragraph 2 in two ways, and the original unaltered text undermines the court's conclusion.

First, the district court inserted the bracketed term "Resort" in place of the actual text "Premises." If the parties had used the term "Resort," it could be

argued that this sentence refers to the resort Improvements.  But the actual text reads "Premises," which is a defined term that means: "the land . . . exclusive of all other improvements thereon."  Appx695.  Whatever else may be said about this sentence in paragraph 2, it <u>does not</u> address the Improvements.  And it is improper to alter the text by inserting a word that encompasses the Improvements.

<u>Second</u>, the district court used ellipses to omit the following clause: "to be determined by Grantor pursuant to the provisions set forth herein."  Appx696.  This clause makes clear that this sentence in paragraph 2 is not declaring that the property will under all circumstances become part of the park.  Instead, paragraph 2 expressly states that, while there is an "expectation" the land will one day be operated as a park, that can only occur "pursuant to the provisions set forth herein."  Those provisions include paragraph 8, which states that the resort operator may terminate early and submit "an offer" for the Improvements that requires an "acceptance."  And if the Government does not accept that offer, the land reverts and the property does <u>not</u> become part of the park.

Thus, the sentence in paragraph 2 states only the expectation that the land will become part of the National Park.  But it does not suggest that this will necessarily happen, nor does it suggest that this will be accomplished by a gift of the Improvements.  In fact, this sentence is quite careful in not including any mention of the Improvements, or any mention of a gift.  Instead, it expressly defers

to the other commercial "provisions set forth herein," which include the offer and acceptance provision of paragraph 8.  It was error for the district court to "rewrite the contract."  *Arvidson v. Buchar*, 72 V.I. 638, 651 (Super. Ct. 2020).

### D. The district court erroneously concluded that early termination and expiration are identical in that "the land and improvements wind up in a single set of hands."

The district court asserted: "contrary to what EHIA claims, the Indenture does not treat the transfer of the improvements differently depending on whether the RUE is terminated early or terminated upon expiration," because no matter how the RUE is terminated "the land and improvements wind up in a single set of hands."  Appx12.

As explained above, the district court is simply wrong.  There is a stark difference between how the Improvements are handled upon early termination of the RUE and upon expiration of the RUE.  And, as explained above, this difference demonstrates that reversion of the land upon rejection of "an offer" was not for the purpose of placing the land and improvements in a single owner.

### E. The district court erroneously relied on its assumption that the Government would not agree to a "sudden demand" that would cause it to "forfeit" the land.

The district court concluded that it was "far-fetched" that the Government would agree to give JHPI an option to "suddenly demand that it pay an unknown number of millions of dollars or else forfeit several hundred acres of prime

beachfront property." Appx12-13. Both parts of this conclusion are false.

*First*, the purported absurdity is based on an imaginary forfeiture risk. By entering the Indenture contract, the Government did not risk forfeiting "several hundred acres of prime beachfront property," because it never owned that property before it entered the Indenture. In truth, the Government took title to the land subject to the put provision in paragraph 8, and this transaction had zero risk for the Government. Four scenarios were possible:

(1) JHPI retains the RUE and, upon expiration, elects to gift the Improvements to the Government, in which case the Government gets valuable land and resort improvements for free;

(2) same as scenario 1, except JHPI elects to retain ownership of the Improvements after expiration, in which case the government gets valuable land for free;

(3) JHPI or an assignee exercises the early termination option, and the accompanying offer is accepted by the Government, in which case the Government gets valuable land and resort improvements for just the cost of the improvements; or

(4) same as scenario 3, except the Government does not accept the offer, in which case the Government owns nothing.

In the first three scenarios, the Government receives a valuable gift; in the

fourth scenario the Government neither gains nor loses and winds up exactly where it started without title to the land. All upside and no downside. It was not at all farfetched for the Government to agree to such an Indenture.

*Second*, contrary to the district court's conclusion, the resort operator could not "suddenly demand" anything. Appx13. Paragraph 8 was structured so that, after receiving the offer for the Improvements, the Government had six months to consider accepting and to, for example, receive bids from replacement concessionaires to fund purchase of the Improvements. And because the resort operator must give a full year's notice of termination, following acceptance the Government had at least an additional six months to complete whatever arrangements are needed to consummate the deal. As the district court itself found, this gave the Government plenty of time for "finding a concessionaire" or to ensure that it had "budgetary capacity." [3] Appx16.

---

[3] EHI also submitted unrebutted evidence that, throughout the relevant time, the National Park Service had appropriations of unobligated funds for "improvements, repair, or replacement of physical facilities" as well as additional funds for operation that were more than sufficient to meet the $70 million purchase price for the Improvements. Appx275-280, Facts 59-79; Appx444-449, Facts 59-79. And EHI also demonstrated that "Congress has often passed bills to authorize appropriations of funds in less than 90 days" including appropriations for billions of dollars. *Id.*

**F.    The district court erroneously concluded that an offer to transfer for value renders the expiration provision "superfluous."**

The district court reasoned that "EHIA's reading of 'offer' would have an absurd consequence," because if JHPI sold its rights to a commercial resort operator, that for-profit company would always exercise the early termination options so as to be reimbursed for the Improvements, and the RUE would never proceed to expiration.  Appx13-14.  The court concluded that this "nullifies the possibility that the RUE could expire," which renders the expiration provision "pointless, superfluous, or ineffective."  Appx14 (internal quote omitted).

This reasoning fails, because JHPI was not obligated to sell its rights to a commercial operator.  JHPI could retain its rights, and allow the RUE to proceed to expiration.  To cover this scenario, it was essential to include the RUE expiration provision in the Indenture.  Thus, EHI's interpretation does not render the expiration provision superfluous.

**IV.   None of the Government's proffered extrinsic evidence addressed the meaning of "an offer."**

"It is inappropriate to consider extrinsic evidence when no ambiguity exists."  *McDonald v. Davis*, No. 2004-93, 2009 U.S. Dist. LEXIS 17309, at *20 (D.V.I. Mar. 5, 2009) (cleaned up, quoting *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001)).  The district court properly concluded that because "the contract is unambiguous, we need not consult extrinsic evidence to aid our

interpretation." Appx17. But the district court considered the Government's extrinsic evidence anyway, which was error. Appx17-18. Moreover, the district court violated controlling principles of law governing extrinsic evidence.

The "key inquiry" in determining whether an item of extrinsic evidence may be consulted is "whether the proffered evidence is about the parties' objectively manifested linguistic reference regarding the terms of the contract, or is instead merely about [the parties'] expectations." *McDonald v. Davis*, No. 2004-93, 2009 U.S. Dist. LEXIS 17309, at *20-23 n.11 (D.V.I. Mar. 5, 2009) (quoting *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 94 n.3 (3d Cir. 2001)). The "former" is "the right type of extrinsic evidence," but "the latter is not." *Id.*

To be relevant, therefore, the extrinsic evidence must bear on the "meaning of a specific term or terms contained in the contract" and not merely evidence "regarding a party's beliefs about the general ramifications of the contract." *Bohler-Uddeholm*, 247 F.3d at 96. Thus, extrinsic evidence may be consulted only where it addresses the specific terms in the contract that are purportedly ambiguous, and not if it merely expresses a party's general expectations about the contract.

Here that means the district court could only consult extrinsic evidence bearing on the early termination of the RUE, and in particular evidence that addresses the purportedly ambiguous phrase ("an offer … to convey and transfer").

Statements about general expectations may not be considered.

None of the Government's extrinsic evidence addressed any part of the language in dispute. None of it addressed the subject of making an offer to transfer the improvements. In fact, none of it even addressed the circumstance of early termination of the commercial resort at all.

The district court cited to three items of extrinsic evidence. The first item was a 1982 letter from JHPI to the Secretary of the Interior, in which JHPI discussed that "JHPI would also donate the buildings." Appx17. But, as the district court acknowledged, JHPI was referring to a donation "at the end of" the RUE. Appx17. This was not a discussion of what commercial terms would be sensible in the Indenture if JHPI elected to <u>not</u> gift the Improvements to the Government and instead sold the RUE and the Improvements to a for-profit commercial operator.

And months later, when drafting the Indenture, the parties did not include any provision gifting the Improvements to the Government. Nor did they include a provision requiring that JHPI retain control of the Improvements and assign them to the Government at the end of the RUE. Instead, the parties expressly excluded the Improvements from the gift, agreed that JHPI could assign all retained interests to a third party, and drafted extensive provisions to protect the commercial interests of a successor resort operator. These included a put procedure in

paragraph 8, which provides for "an offer" subject to acceptance, and does not mandate a gift.

The remaining two items of extrinsic evidence cited by the district court, a press release, and a closing statement, likewise do not address the put provision in paragraph 8 or a commercial operator's early termination. As the district court acknowledged, the first refers to "the end of the RUE" and the second to "the end of the Retained Use Estate." Appx17.

None of the Government's proffered extrinsic evidence addresses the provision at issue, "an offer … to convey and transfer." The Government relied on each piece of extrinsic evidence only to show a party's general expectations. But consulting extrinsic evidence for that purpose is improper. *McDonald*, 2009 U.S. Dist. LEXIS 17309, at *20-23 n.11.

## V.  EHI is entitled to summary judgment.

The district court's order granting summary judgment in favor of the Government should be reversed. In addition, EHI established all necessary facts entitling it to summary judgment.

To prevail on its quiet title action, EHI needed to prove "the right, title, or interest which the plaintiff claims in the real property." 28 U.S.C.S. § 2409a(d). In this case, that means proving: (i) EHI held the right to reversion of the land, and (ii) EHI submitted a valid "offer" that the Government declined to accept, thereby

triggering automatic reversion.  The Government did not controvert the material facts.  Accordingly, EHI is entitled to summary judgment on its motion.

### A.    EHI held the right to reversion of the land.

In the 1983 Indenture, JHPI retained a reversionary interest in the land.  Just like any other property interest, a "reversionary interest is transferable and alienable."  *Pension Transfer Corp. v. Beneficiaries under the Third Amend. (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 211 (3d Cir. 2006). [4]

In 1986, JHPI as "Assignor" assigned to Rockresorts, Inc. "all of Assignor's right, title and interest to use and occupy the Premises pursuant to, *and all other rights granted or reserved to Assignor in, the Indenture*."  Appx1145.  The reversionary interest was one of the rights "granted or reserved" to JHPI in the 1983 Indenture.  And "all" means all.  Therefore, JHPI's assignment to Rockresorts of "all other rights granted or reserved" encompassed the right to reversion.

Then Rockresorts assigned all rights to Estate Holdings, Inc., including "all other rights granted or reserved to JHP."  Appx787; Appx1053, Fact 9.  And in 2004, Estate Holdings, Inc. assigned all rights to EHI, including "all other rights

---

[4] "'[T]he almost universal policy of our laws [is] to allow, if not to favor, the right to free alienation of property,'" which means allowing the "transfer of property to another." *Christopher v. Skinner*, No. ST-13-CV-575, 2014 V.I. LEXIS 147, at *17 (V.I. Super. Sep. 26, 2014) (cleaned up) (quoting *Maxwell v. Moore*, 63 U.S. 185, 188 (1859)).

granted or reserved to JHP, as assigned by JHP to Rockresorts and by Rockresorts to Assignor."  Appx807; Appx1054, Fact 10.  That assignment expressly included "all other rights."

Finally, as a belt and suspenders, when EHI acquired the resort, EHI obtained written acknowledgement from the Government that all of JHPI's rights in the Indenture were being assigned to EHI.  The Government approved EHI receiving the assignment of rights, and expressly approved the "form and substance" of the assignment. Appx815; Appx1054, Fact 11. That approved form expressly recited the chain of title from JHPI to EHI, and the assignment of "all other rights granted or reserved to JHP, as assigned by JHP to Rockresorts and by Rockresorts to Assignor."  Appx818; Appx1054, Fact 11.

The reversion clause in the Indenture states that the land reverts to "Grantor or any successor to Grantor."  Appx699.  As assignee, EHI stepped into JHPI's shoes to exercise all rights of "Grantor" in the Indenture.  "[U]nder general principles of law of assignment, the assignee succeeds to all the rights of his assignor."  *Amgro, Inc. v. Lincoln Gen. Ins. Co*., 361 Fed. App'x 338, 344 (3d Cir. 2010).  The "assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held."  *Medtronic AVE Inc. v. Advanced Cardiovascular Sys*., 247 F.3d 44, 60 (3d Cir. 2001).  Thus,

when EHI was assigned all rights of JHPI, EHI stepped into JHPI's shoes to exercise all rights of "Grantor" as if EHI were itself "Grantor."

In fact, the Government expressly acknowledged that "the Grantor did transfer its remaining interest to a predecessor of your company" and the Government characterized EHI as "successor to the grantor." Appx869; Appx1062, Fact 39. And in the litigation, the Government expressly admitted: "Plaintiff is the current holder of the rights to the RUE." Appx265, Fact 26; Appx1072, Fact 77.

The district court properly concluded that EHI "acquired the present and future interests in the improvements." Appx5.

## B. EHI submitted a valid offer that the Government failed to accept, thereby triggering reversion to EHI.

On April 30, 2019, EHI provided written notice that "EHI will terminate and extinguish the RUE one year from the date of receipt of this Termination Notice." Appx877; Appx1065, Facts 48-49. EHI thus provided "one (1) year's prior written notice" for termination, and EHI specified a termination date that is "after September 30, 1986," as required by the 1983 Indenture. Appx698; Appx877; Appx1065, Facts 48-50. EHI's notice of termination included "an offer… to convey and transfer to Grantee fee title in and to all improvements," Appx877; Appx1065, Fact 51. The consideration EHI requested in its offer was at or below fair market value for the Improvements. Appx354-405 (expert reports);

Appx1068-1072, Facts 59-74. EHI also included a "form of an instrument to effect such conveyance and transfer." Appx698; Appx890-892; Appx1066, Fact 52. EHI thus fulfilled all requirement specified in the Indenture for "an offer."

Finally, EHI received written notice from the Government advising that it did not accept EHI's offer for the Improvements. Appx901-903; Appx1066, Fact 54. Because the Government failed to accept EHI's offer, title to the Premises "revert[ed], automatically, and without further deed," to EHI. Appx699; Appx1052, Fact 5; Appx1073 Fact 83.

The Government failed to controvert any of these material facts. Appx1051-1074. Therefore, EHI is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, EHI requests that this Court reverse the orders of the district court, deny the Government's motion for summary judgment, grant EHI's motion for summary judgment, and remand for entry of final judgment in favor of EHI.

## REQUEST FOR ORAL ARGUMENT

The ownership of the Caneel Bay land and Resort is of vital importance to the Virgin Islands community, and this case presents legal issues warranting oral argument. Appellant respectfully requests 15 minutes of oral argument time.

Dated: September 30, 2024      Respectfully submitted,

By: */s/ Craig M. O'Shea*

Craig M. O'Shea (VI Bar No. R2072)
**DUDLEY NEWMAN FEUERZEIG LLP**
1000 Frederiksberg Gade
St. Thomas VI 00802
Telephone: (340) 774-4422
coshea@dnfvi.com

-and-

Gregory Dovel (CA Bar No. 135387)
Julien Adams (CA Bar No. 156135)
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Tel: 310-656-7066
greg@dovel.com
julien@dovel.com

Attorneys for Appellant EHI Acquisitions,
LLC

**CERTIFICATIONS**

Pursuant to Fed. R. App. P. 32 and the 3d Cir. L.A.R. 32, I hereby certify that the foregoing document was prepared using 14-point Times New Roman font, which is proportionately spaced. I further certify that the foregoing Appellant's Brief, contains 12982 words, excluding cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, addendum containing statutes, rules, or regulations, certifications of counsel, signature blocks, and appendix volume 1.

Pursuant to the Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic copy of this brief is identical to the text of the paper copies, and that this document was scanned using a virus detection program, Vipre Virus Protection, version 3.1, and that no virus was detected.

Dated: September 30, 2024          Respectfully submitted,

By: /s/ Craig M. O'Shea

Craig M. O'Shea (VI Bar No. R2072)
**DUDLEY NEWMAN FEUERZEIG LLP**
*Attorney for Appellant*

# CERTIFICATION OF BAR MEMBERSHIP

Pursuant to the Third Circuit Local Appellate Rule 46(e), I hereby certify that I am a member of the bar of this Court.

**DATED:** September 30, 2024      By: _/s/ Craig M. O'Shea_
                                       CRAIG M. O'SHEA, ESQ.
                                       Dudley Newman Feuerzeig LLP
                                       _Attorney for Appellant_

**CERTIFICATION OF FILING AND SERVICE**

I, Elissa Diaz, hereby certify pursuant to Fed. R. App. P. 25(d) that, on September 30, 2024, the foregoing Brief and Appendix Volume I for Appellant was filed through the CM/ECF system and served electronically.

Unless otherwise noted, seven copies will be filed with the Court within the time provided in the Court's rules via Federal Express.

/s/ Elissa Diaz
Elissa Diaz

APPENDIX  1

# TABLE OF CONTENTS

**Page**

**Volume I:**

Opinion and Order, filed April 22, 2024 ......................................................... Appx1

Order, filed April 22, 2024 ............................................................................. Appx21

Order, filed May 22, 2024................................................................................ Appx22

Notice of Appeal, filed July 17, 2024 ............................................................. Appx25


**Volume II:**

Docket Entries ................................................................................................. Appx27

Complaint, filed June 30, 2022........................................................................ Appx42

Defendant's Motion to Dismiss or, in the Alternative for Summary, filed
    March 3, 2023 .......................................................................................... Appx68

Defendant's Memorandum in Support of Motion to Dismiss or , in the
    Alternative, for Summary Judgment, filed March 3, 2023 ...................... Appx70

Defendant's Statement of   Materials Facts about which there is no
    Genuine Issue, filed March 3, 2023 ........................................................ Appx87

    Defendant's Exhibit 1: Letter from Jackson Hole Preserve
    Incorporated to Laurance S. Rockefeller, dated March 2, 1982 .............. Appx97

    Defendant Exhibit 7: Letter from Rob Wallace to Gary D. Engle,
        dated October 10, 2019...................................................................... Appx99

    Exhibit 8: Letter from Franklin E. Parker to Clayton W. Frye, Jr and
        George R. Lamb, dated November 11, 1982................................... Appx102

    Exhibit 9: Press Release ......................................................................... Appx108

i

Exhibit 10:  Virgin Islands Daily News Article ....................................... Appx111

Exhibit 11:  Letter from Laurance S. Rockefeller to William Penn
    Mott, dated November 30, 1988........................................................ Appx112

Exhibit 12:  Indenture Statement of Closing .......................................... Appx114

Exhibit 13:  CBIA and EHI's Response to DOI, dated June 11, 2019 .... Appx121

Exhibit 14:  CBIA and EHI;s Response to DOI, dated December 11,
    2019 ................................................................................................... Appx123

Exhibit 15:  Letter from DOI to EHI and CBI, dated
February 6, 2020 ....................................................................................... Appx126

Exhibit 16:  First Priority Mortgage Construction Security Interest,
    dated July 11, 1989.................................................................................. Appx128

Exhibit 17:  Assumption, Amendment and Restatement of Mortgage,
    dated May 10, 2004 ................................................................................. Appx168

Exhibit 18:  First Bank of Puerto Rico Mortgage Assignment of
Rents  and Leases and Security Agreement, June 15, 2015..................... Appx187

Exhibit 19:  Assignment of Mortgage and Loan Documents, dated
May 14, 2018............................................................................................. Appx212

Plaintiff EHI's Memorandum in Opposition to Defendant's Motion to
Dismiss or in the alternative, for Summary Judgment, filed April 24,
2023............................................................................................................ Appx221

Plaintiff's response to Defendant's statement
of material facts and Plaintiff's additional material facts, filed April 24,
2023............................................................................................................ Appx 248

Expert Report of Nancy J. Rich, filed April 24, 2023 ..................................... Appx298

Exhibit A.1:  CBIA – Caneel Bay mailing mid November 2021 ............ Appx309

Exhibit A.2:   Agreement and Covenant not to sue South Carolina
state Ports Authority ........................................................... Appx320

Exhibit A.3:   Litigation Agreement All States........................................ Appx345

Exhibit B:  Curriculum Vitae of Nancy J. Rich ...................................... Appx350

Valuation Expert Report by Edward Schlaffer, filed April 24, 2023 .............. Appx354

Gary Eagle Summary of Facts and Opinions, filed April 24, 2023................. Appx395

Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or, in
the Alternative, For Summary Judgment, filed May 26, 2023 ............... Appx407

Defendant's Exhibit 20:  Plaintiff's Response to Defendant's First
Request for Admissions ........................................................ Appx422

Exhibit 21:  Letter to Connecticut General Life Insurance Co.,
JHPI Board Chairman and Senior Advisor, Clayton W. Frye, Jr.,
dated July 20, 1982.................................................................. Appx439

Exhibit 22:  Memo to L.S. Rockefeller, C.W. Frye, dated January
12, 1983 ............................................................................ Appx441

Defendant's Reply to Plaintiff's Statement of Additional Material Facts,
filed May 26, 2023 ................................................................... Appx442

Plaintiff EHI Acquisitions, LLC's Motion for Summary Judgment or, in
the Alternative, Partial Summary Judgment, filed June 16, 2023 ........... Appx461

Plaintiff EHI's Memorandum in Support of Motion for
Summary Judgment or, in the Alternative, Partial Summary
Judgment., filed June 16, 2023.................................................. Appx463

Exhibit 28:  Black's Law Dictionary, Fifth Edition ................................ Appx486

Exhibit 29:  Black's Law Dictionary, abridged Sixth Edition ................. Appx490

Exhibit 31:  Black's Law Dictionary, Seventh Edition............................ Appx494

Declaration of Patrick Kidd in support of Plaintiff EHI's Motion for
    Summary Judgment or, in the Alternative, for Partial Summary
    Judgment, filed June 16, 2023.................................... Appx497

    Exhibit A:  Petition titled "Support EHI's Plans to Rebuild Caneel
    Bay,...................................................... Appx500

    Exhibit B: list of people that signed the petition titled
    "Support EHI's Plans to Rebuild Caneel Bay" as of June 8, 2023.......... Appx504


**Volume III:**

Declaration of Almando Liburd in support of Plaintiff EHI's Motion for
    Summary Judgment or, in the Alternative, for Partial Summary
    Judgment, filed June 16, 2023.................................... Appx641

    Exhibit A:  Petition .................................................. Appx644

Declaration of Isabel Riggs in support of Plaintiff EHI's Motion for
    Summary Judgment or in the Alternative, for Partial Summary
    Judgment, filed June 16, 2023.................................... Appx651

    Exhibit A:   Press Release issued by Congresswoman Stacy Plaskett .... Appx654

Plaintiff's separate statement of material facts about which there is no
    genuine issue. ........................................................ Appx661

    Exhibit 2:  Indenture, 1983........................................ Appx694

    Exhibit 3:  Deed, dated December 29, 1977 ........................... Appx708

    Exhibit 6:  Plaintiff's Response to Defendant's Statement of material
        facts and Plaintiff's additional Material facts .................. Appx720

    Exhibit 7:  Indenture, 1986........................................ Appx771

    Exhibit 8:  1991 Assignment of the 1983 RUE ...................... Appx783

    Exhibit 9:  Assignment and Assumption of Retained use Estate............. Appx805

Exhibit 10:  Assignment and Assumption of Retained Use Estate .......... Appx814

Exhibit 11: Declaration of Gary Engle in support of Plaintiff EHI's
        Opposition to Defendant's Motion to Dismiss or for Summary
        Judgment ......................................................................... Appx823

Exhibit 12:  Indenture, 1986 ..................................................... Appx835

Exhibit 13:  Letter from Gary Engle to Aurelia Skipwith of
        Department of the Interior ................................................ Appx847

Exhibit 14: July 14, 2017, Letter from Ms. Johnson, Acting
        Assistant Secretary for Fish and Wildlife and Parks to Gary
        Engle .............................................................................. Appx855

Exhibit 15:  Term Sheet for a Lease for the Caneel Bay Resort
        signed on December 8, 2020 ............................................ Appx858

Exhibit 16:  Letter from Todd D. Willens to Gary D. Engle, dated
        August 18, 2017 .............................................................. Appx868

Exhibit 17:  Email from Gary Engle to Greg Dovel, dated April 18,
        2023 ............................................................................... Appx871

Exhibit 18: April 30, 2019, Notice of Termination Letter ...................... Appx874

Exhibit 19: June 11, 2019, Letter from Daniel H. Jorjani to Gary
        Engle .............................................................................. Appx900

Exhibit 23: Special Notice Letter Feb. 15, 2023 .................................... Appx904

Exhibit 24: Lease, 1977 ............................................................... Appx911

Exhibit 25: 1983 Corrective Deed.................................................... Appx942

Exhibit 26: 1991 Deed................................................................. Appx954

Exhibit 27: 2003 Indenture............................................................ Appx964

Exhibit 30: Defendant's Response to Plaintiff 's First Set of
    Interrogatories.................................................................... Appx981

Opposition to Plaintiff's Motion for Summary Judgment or, in the
    Alternative, Partial Summary Judgment, filed July 7, 2023 ................... Appx990

Defendant's Response to Plaintiff's Statement of Material Facts, filed
    July 7, 2023 ............................................................................ Appx1008

Declaration of Nigel A. Fields, filed July 7, 2023 ......................................... Appx1025

EHI's Reply Memorandum in Support of [Dkt. 83] EHI's Motion for
    Summary Judgment or, in the Alternative, Partial Summary
    Judgment, filed August 4, 2023 .............................................. Appx1028

Plaintiff's Reply Statement of Material Facts, filed August 4, 2023 ............. Appx1051

Response To Order for Supplemental Briefing, filed February 9, 2024 ........ Appx1076

Plaintiff EHI's Response to Order for Supplemental Briefing, filed
    February 9, 2024 ..................................................................... Appx1092

Motion for Reconsideration, and to Alter or Amend the Court's Summary
    Judgment Orders (ECF NOS. 161 and 163), filed May 3, 2024.............. Appx1116

Memorandum of Law in Support of Motion for Reconsideration and to
    Alter or Amend the Court's Summary Judgment Orders (ECF NOS.
    161 and 163), filed May 3, 2024 ............................................. Appx1118

Opposition to Plaintiff's Motion for Reconsideration, and to Alter or
    Amend the Court's Summary Judgment Orders, filed May 17, 2024 ..... Appx1127

Plaintiff's Unopposed Motion that Judgment Be Set Out in a Separate
    Document, filed June 17, 2024 ............................................... Appx1135

Response to Plaintiff's Unopposed Motion that Judgment Be Set Out in
    A Separate Document, filed June 18, 2024............................... Appx1137

Exhibit A: Email from Joycelyn Hewlett to Julien Adams, dated
    June 18, 2024......................................................................... Appx1139

Exhibit B:  Final Judgment, dated April 22, 2024 ...................................  Appx1141

Order, dated June 21, 2024 ..............................................................  Appx1142

Exhibit 9:  1986 RUE Assignment ...................................................  Appx1143

## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **EHI ACQUISTIONS, LLC,** <br><br> Plaintiff, <br><br> -v.- <br><br> **UNITED STATES OF AMERICA,** <br><br> Defendant. | 3:22-cv-00044 <br><br> **OPINION AND ORDER** |

### MEMORANDUM OPINION AND ORDER

CHERYL ANN KRAUSE, Circuit Judge, sitting by designation.

Plaintiff EHI Acquisitions, LLC, has brought this action against the United States to quiet title to the Caneel Bay Resort in St. John, Virgin Islands. Before the Court are Plaintiff's motion for summary judgment; the United States' motion to dismiss for failure to state a claim or, in the alternative, for summary judgment; and various motions in limine. We will GRANT the United States' motion for summary judgment and DENY Plaintiff's motion for summary judgment. All pending motions in limine are DISMISSED AS MOOT.

### I.    Background

On December 1, 1956, Jackson Hole Preserve, Inc. (JHPI), a conservation nonprofit run by Laurance Rockefeller, gave five thousand acres on the island of St. John to the United States Government. Earlier that year, Congress had authorized the creation of the Virgin Islands National Park, 16 U.S.C. §§ 398–398f, and Rockefeller's donation served

1

as the park's founding gift. Rockefeller retained a 150-acre parcel on Caneel Bay, a picturesque spot on a peninsula that juts out from St. John's northwest corner. There, he operated the Caneel Bay Resort.

In 1977, for reasons the record does not make clear, Rockefeller created a corporate structure that would sever ownership of the resort's land from that of its buildings for a period of 30 years. In exchange for ten dollars, JHPI took title to the land, while another Rockefeller entity, Caneel Bay, Inc., retained the structures and other improvements from December 29, 1977 until December 31, 2007, when title to those structures and improvements would transfer to JHPI. Along with the deed, these entities executed a lease through which JHPI leased the land on which the structures stood back to Caneel Bay, Inc. for that 30-year period. Thus, had nothing changed, the structures and improvements would have reverted to JHPI on December 31, 2007, reuniting the land and buildings and making JHPI the sole owner of a profitable resort.

But things did change, because Rockefeller's long-term goal was an altruistic one. In 1982, he wrote to then-Secretary of the Interior James Watt to offer the resort to the United States Government. In his letter, Rockefeller told Watt that it had been JHPI's "long-term objective" to make the resort part of Virgin Islands National Park. Letter from Laurance Rockefeller to James Watt at 1 (Mar. 2, 1982), ECF No. 19-1 (Rockefeller Letter). To that end, Rockefeller proposed that JHPI donate the resort's land to the United States while retaining the exclusive right to use the property for thirty years. According to Rockefeller, "[a]t the end of this time"—presumably, on or after December 31, 2007, when the structures and improvements reverted from Caneel Bay, Inc. to JHPI—"JHPI would

2

also donate the buildings and other facilities at Caneel Bay to the National Park Service."
*Id.*

Rockefeller's plan was reduced to writing in the document now at the heart of this litigation. In an indenture executed by the Government and JHPI on September 30, 1983 (the "Indenture"), JHPI gave the United States title to the resort's land, while Caneel Bay, Inc. continued to own the improvements. The Indenture also created a new interest in the property, a so-called "Retained Use Estate" (RUE), which gave JHPI the exclusive right to use and occupy the resort until September 30, 2023. That right was not absolute: In a paragraph entitled "Maintenance of Premises by Grantor Prior to Termination of Retained Use Estate," the Indenture stated:

> It is Grantor's [i.e. JHPI's] expectation and intention that at some future time . . . the Retained Use Estate will be terminated and extinguished in order to carry out the longstanding objective of Grantor that the Premises ultimately be an integral part of the Virgin Islands National Park . . . for the use and enjoyment by visitors to the Park of the outstanding scenic and other features of national significance located both within the Premises and in other areas of the Park. In keeping with this objective, Grantor agrees that, at all times prior to the termination of the Retained Use Estate . . . Grantor will use and maintain the Premises in such a manner that will (a) be consistent with the preservation of such outstanding scenic and other features of national significance and (b) preserve the Premises to the extent feasible in their natural condition for the public benefit, enjoyment and inspiration, subject, however, to the right of Grantor to operate guest facilities for the accommodation of visitors to the Park . . . .

1983 Indenture at 2, ECF No. 1-3. The Indenture allowed JHPI to transfer the RUE, so long as the transferee agreed to fulfill the conservation duties just described. As to exchange for value, the Indenture explained that "[t]his conveyance is by way of gift,

3

without consideration except the nominal consideration" of the one dollar that was recited earlier in the document.  *Id.* at 6.

JHPI was required to keep the RUE for the first three years of its existence, i.e., until September 30, 1986.  After that date, however, it was permitted to terminate the RUE before the September 30, 2023 expiration.  Paragraph 8 of the Indenture set out the procedure for this early termination.  First, JHPI (or its successor) was required to give the Government at least one year's notice of its intent to terminate, including an offer "to convey and transfer" to the Government "all improvements located on the Premises" upon the RUE's extinction.  *Id.* at 4.  The Government would then have until 180 days before the termination date to decide if it wished to accept title to the improvements.  If it did—and if, within one year of the RUE's termination, it decided to continue operating "public accommodations, facilities, and services" on the premises—it was to give JHPI or its successor the chance to bid to provide those services.  *Id.* at 5.

If, on the other hand, the Government declined to accept title to the improvements, then title to the land would revert to JHPI "automatically and without further deed."  *Id.*  The land would also revert to JHPI if the land "or any part thereof shall at any time cease to be included within" Virgin Islands National Park.  *Id.*

On the same day that the Government and JHPI executed the Indenture, JHPI and Caneel Bay, Inc. amended their 1977 agreements so that both Caneel Bay, Inc.'s interest in the improvements and its lease on the Premises would run until September 30, 2023—the RUE's expiration date—rather than December 31, 2007.  Thus, after the Indenture's execution, three entities held interests in the land and improvements at Caneel Bay Resort:

4

Appx4

The United States owned the land; Caneel Bay, Inc. leased the resort's land from JHPI and held title to the improvements until September 30, 2023; and JHPI held the RUE, the lessor's interest in the land, and the future interest in the improvements. As long as JHPI and Caneel Bay, Inc. remained in the picture, Rockefeller's idyllic vision seemed just over the horizon.

But it was not to be smooth sailing. Three years after signing the Indenture, JHPI assigned all its interests in the resort to RockResorts, Inc., and in the following decades, the interests in Caneel Bay changed hands several times, except for title to the land, which the United States continued to own subject to the RUE. By 2017, Plaintiff EHI Acquisitions, LLC (EHIA) had acquired the present and future interests in the improvements, the lessor's interest in the land, and the RUE. Its affiliate, CBI Acquisitions, Inc. (CBIA), held the lessee's interest in the land, and together, they ran and made various improvements to the resort, which drew more than 15,000 guests per year and served as St. John's largest employer.

That all came to a jarring halt in September of 2017, when Hurricanes Irma and Maria caused catastrophic damage to St. John, including Caneel Bay. The resort was shuttered, and it quickly became apparent to EHIA and CBIA that they would need a significant infusion of cash—or at least the assurance of a significant future cash stream—to make the repairs and improvements necessary to reopen. EHIA and CBIA initially attempted to negotiate an extension of the RUE with the Government, but those talks proved unsuccessful.

5

So, on April 30, 2019, the entities made a new proposal.  Homing in on the language in the Indenture, Gary Engle, the "Authorized Representative" of both EHIA and CBIA, sent a letter to then-Secretary of the Interior David Bernhardt giving notice of EHIA's intent to terminate the RUE pursuant to Paragraph 8 of the Indenture and to transfer the improvements to the Government.  Letter from Gary D. Engle to David Bernhardt at 3 (Apr. 30, 2019), ECF No. 19-5.  But as a condition of that transfer, Engle demanded a payment of $70 million, as well as a release and indemnification by the Government "from all environmental liabilities related to the RUE and related to the Caneel Bay land and Improvements."  *Id.* at 3.

The Government balked, denying that the letter was an effective notice of termination and describing EHIA's demand for payment and indemnification before conveyance as "at odds with both the terms of the Indenture and the clear donative intent described therein."  Letter from Daniel H. Jorjani to Gary D. Engle at 2 (June 11, 2019), ECF No. 19-6.  The Government offered to negotiate an end to the RUE "in a manner that would be beneficial to all parties, as well as to residents of the Virgin Islands and the American People," *id.* at 1, but the parties could not reach consensus: Engle maintained that his letter constituted a valid offer under Paragraph 8 and that, because the Government had not accepted the offer by 180 days before the purported termination date, title to the resort land had "automatically reverted to EHI[A] and CBIA."  Letter from Gary D. Engle to Rob Wallace at 1 (Dec. 11, 2019), ECF No. 38-14.  The Government, meanwhile,

steadfastly refused to acknowledge the letter as an effective notice of termination in the first place.[1]

As a result, EHIA filed this suit to quiet title on June 30, 2022.  On March 3, 2023, the United States filed a motion to dismiss for failure to state a claim under Rule 12(b)(6) or, in the alternative, for summary judgment.  A few months later, EHIA filed its own motion for summary judgment.  This Court now resolves those dispositive motions.

## II.    Legal Standard

In a contract interpretation dispute, "summary judgment is appropriate only where the contractual language is unambiguous—*i.e.* subject to only one reasonable interpretation."  *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418 (3d Cir. 2013) (citation omitted).  "We apply the forum's contract interpretation law unless the contract has a choice-of-law provision."  *Williams v. Medley Opportunity Fund II,* 965 F.3d 229, 238 (3d Cir. 2020) (citation omitted).  The Indenture contains no such provision, so the Court will apply the law of the Virgin Islands.

---

[1] The record shows that the parties discussed a possible lease arrangement and held at least one meeting, but these attempts were evidently unsuccessful.  *See* Letter from Rob Wallace to Gary D. Engle at 1 (Feb. 6, 2020), ECF No. 38-15.  Two attempts at mediation after EHIA filed suit also failed.  *See* ECF Nos. 45, 136.

Appx7

### III.    Discussion[2]

The dispute between EHIA and the United States hinges on the meaning of the word "offer" as it is used in the Indenture.  EHIA maintains that it means "to offer in exchange for value," while the Government says it means "offer to convey at no cost."  Applying the relevant principles of contract interpretation, we agree with the Government: The Indenture evinces an unambiguous intent to convey both the resort's land and its improvements to the United States upon the RUE's termination "by way of gift, without consideration except the [$1.00] nominal consideration" set forth in the Indenture.  1983 Indenture at 6.  EHIA's interpretation is contrary to that intent, which is further confirmed by the relevant extrinsic evidence.

### A.  Interpretation and Construction of the 1983 Indenture

The Indenture is a kind of deed.  *See Indenture*, Black's Law Dictionary (11th ed. 2019) ("A deed or elaborate contract signed by two or more parties.").  The Supreme Court of the Virgin Islands has held that "[a] deed is a contract, and thus in most circumstances the principles of contract interpretation govern." *Streibich v. Underwood*, 74 V.I. 488, 502 (2021).  When we read a contract, "our primary purpose is to ascertain and give effect to the parties' objective intent."  *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 624–25 (2017).  "Objective intent" refers to what the contract's words "would mean in the mouth of a

_____

[2] This Court has jurisdiction pursuant to 28 U.S.C. § 1346(f), which gives district courts original and exclusive jurisdiction over civil actions to quiet title to "real property in which an interest is claimed by the United States."

normal speaker of English, using them in the circumstances in which they were used." *Id.*
at 625 (quoting *United Corp. v. Tutu Park Ltd.*, 55 V.I. 702, 719 n.14 (2011)).

As that language suggests, the Court does not conduct its inquiry in a vacuum; it
"reads the contract in the context in which it was made," considering, among other things,
"the words of the contract, the alternative meaning suggested by counsel, and the nature of
the objective evidence to be offered in support of that meaning." *Pacitti v. Macy's*, 193
F.3d 766, 773 (3d Cir. 1999) (Alito, J.) (quoting *Hullett v. Towers, Perrin, Forster &
Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994)); *see also* 11 *Williston on Contracts* § 32:7
(4th ed. 2023) ("Ordinarily, the circumstances surrounding the execution of a contract may
always be shown and are relevant to a determination of what the parties intended by the
words they chose."). While the parol evidence rule bars parties from introducing evidence
of agreements made before or at the same as the contract, it does not forbid courts from
looking at "the relations of the parties, their connection with the subject-matter of the
contract, and the circumstances under which it was signed." *Chicago, R.I. & P. Ry. Co. v.
Denver & R.G.R. Co.*, 143 U.S. 596, 609 (1892); *see also* 11 *Williston on Contracts* § 32:7.

Our first task is to determine whether the Indenture is ambiguous—that is, whether
Paragraph 8 is subject to more than one reasonable interpretation when it requires the
RUE's holder to pair any notice of intent to terminate the RUE with "an offer . . . to convey
and transfer [all improvements on the Premises] to" the United States. 1983 Indenture at
4.

As it is ordinarily used, "offer" means "to present for acceptance or rejection: hold
out." *Offer*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-

9

webster.com/unabridged/offer (last visited Apr. 9, 2024). The term typically carries the same meaning in legal parlance. The edition of *Black's Law Dictionary* that was current when the Indenture was executed defines "offer" as "[a] proposal to do a thing or pay an amount, usually accompanied by an expected acceptance, counter-offer, return promise or act." *Offer*, *Black's Law Dictionary* (5th ed. 1979); *see also Offer*, *Black's Law Dictionary* (11th ed. 2019) ("The act or an instance of presenting something for acceptance; specif., a statement that one is willing to do something for another person or to give that person something . . . ."). As a purely textual matter, then, "offer" does not mean "offer to sell"; it simply means "to present for acceptance or rejection."

Yet our inquiry is not confined to dictionaries. What matters most is what the parties understood the term to mean in the context in which they used it. Examining the plain language of Paragraph 8 in the context of the whole Indenture, we are convinced that this meaning was entirely philanthropic.

Paragraph 8, by its terms, says only that a termination notice shall be accompanied by "an offer . . . to convey and transfer" title to the improvements. 1983 Indenture at 4. It does not say that the Grantor shall make "an offer to convey for value" or "an offer to sell." Indeed, commercial language like "bargain" or "fair market value" is conspicuously omitted from the Indenture. When parties use clear and unambiguous terms, we will not insert additional terms that are contrary to the parties' plain meaning. *Weary v. Long Reef Condo. Ass'n*, 57 V.I. 163, 169–70 (2012); *see also Williams v. Metzler*, 132 F.3d 937, 947 (3d Cir. 1997) ("Absent indicia that, at the time the contract was executed, the parties assigned a specialized meaning to an otherwise common term, we will not alter its accepted

10

usage."). Thus, here, the plain language of Paragraph 8 indicates that the parties did not intend to make the improvements' transfer contingent on payment.

That meaning is bolstered by the surrounding provisions of the Indenture. For one, the Indenture's conclusion explicitly states that "[t]his conveyance is by way of gift, without consideration except the nominal consideration hereinabove recited." 1983 Indenture at 6. While "[t]his conveyance" refers to the 1983 transfer of the land—not the future transfer of the improvements—the statement nonetheless shows that "offer" means "offer as a gift" concerning the improvements as well. Why? Because the Indenture's reversion clause ties the land and improvements together. To keep the land, the Government would have to accept the offer of the improvements. But if that offer were conditioned on payment, then the Government's retention of the land, in effect, also would be conditioned on payment beyond the stated consideration of one dollar—meaning it would no longer be a gift. That result would be contrary to the parties' stated intention, which we are bound to honor.

Paragraph 2 of the Indenture also could not be clearer as to JHPI's "expectation and intention":

> [A]t some future time . . . the Retained Use Estate will be terminated and extinguished in order to carry out the longstanding objective of Grantor that the [Resort] ultimately be an integral part of the Virgin Islands National Park . . . under the jurisdiction of the Secretary for the use and enjoyment by visitors to the Park of the outstanding scenic and other features of national significance located both within the [Resort] and in other areas of the Park.

1983 Indenture at 2. The unmistakable import of this paragraph is that the parties, both nonprofit entities, desired the Caneel Bay Resort to become part of the Virgin Islands

11

National Park "for the public benefit." *Id.* That purpose, stated at the Indenture's outset, makes plain that both the Government's receipt of the land in 1983 and its receipt of the improvements in 2023 or at an earlier "future time . . . [when] the Retained Use Estate [was] terminated" were intended as gifts. *Id.* at 3.

Finally, contrary to what EHIA claims, the Indenture does not treat the transfer of the improvements differently depending on whether the RUE is terminated early or terminated upon expiration. The Indenture is instead structured so that however the RUE ends, the land and improvements wind up in a single set of hands: either the Government's (if it accepts the improvements and incorporates the resort into the National Park) or the Grantor's (if the Government declines the improvements or excludes some part of the resort from the Park). This reversion mechanism is consistent with the parties' stated intent that the Park "ultimately be an integral part" of the National Park "for the public benefit." 1983 Indenture at 2. The gift of the resort to the United States is contingent—not on payment, which is nowhere mentioned in the Indenture—but on the Government's willingness to abide by JHPI's expressly philanthropic vision for Caneel Bay.

EHIA's interpretation of "offer" is not only unsupported by the Indenture's text and structure, but also raises significant obstacles to the contract's implementation. First, it would allow the Grantor to demand payment for early termination at any point between September 30, 1986 and September 30, 2022.[3] In effect, then, EHIA asks us to accept the far-fetched conclusion that in signing the Indenture, the Government agreed to give JHPI

---

[3] Recall that the Indenture requires the Grantor to give a year's notice of intent to terminate the RUE. Thus, the latest it could do so would be September 30, 2022.

12

a 36-year option to suddenly demand that it pay an unknown number of millions of dollars or else forfeit several hundred acres of prime beachfront property.

EHIA attempts to minimize the practical difficulties of holding that the Government agreed to be prepared to spend millions of dollars at any point across three and a half decades.  For instance, it says that the Department of the Interior could have paid its $70 million asking price from one of several discretionary pools in government fiscal year 2019.  Yet it offers no evidence that the Department's discretion over these funds was unfettered.  Nor does it consider the Department's other budgetary demands, or the regulatory prerequisites it may need to satisfy before funds can be released—environmental review, for instance.  In any event, the question before us is not whether the Department of the Interior could in fact meet EHIA's price; it is whether the parties intended a sale when they executed the Indenture.  Every indication is to the contrary.

Second, EHIA's reading of "offer" would have an absurd consequence: EHIA concedes that if the RUE were allowed to expire, the improvements would go to the United States at no cost, yet it maintains that the Government must pay for the improvements if the RUE is terminated early.  Under EHIA's interpretation of the Indenture, it is difficult to imagine why any rational actor would allow the RUE to expire, when doing so would mean giving the Government for free what it could have offered the government at a price—with the sweetener that if the Government declined, the RUE's owner would keep its money and acquire premium property at no cost.  True, these considerations may not have motivated JHPI, a conservation nonprofit tied to the Rockefeller family.  But the Indenture allowed JHPI to convey the RUE to a successor, including one that operates for profit.  That is

13

precisely what happened, and in the eyes of a for-profit entity, the choice between letting the RUE expire and terminating it early is no choice at all. Because "[a]ny [ ] reading which renders contract provisions pointless, superfluous, or ineffective violates basic notions of contract interpretation, and leads to an absurd result which should not be entertained," *Weary*, 57 V.I. at 175 (Hodge, C.J., concurring), we will not adopt an interpretation of "offer" that nullifies the possibility that the RUE could expire.

In sum, had the parties wished to create an anomalous commercial exception to this explicitly charitable scheme—namely, to require the Government to pay for the improvements if and only if the RUE ended early—they would have said so. They did not. Focusing instead on what the parties *did* say, we conclude that "offer" unambiguously means "to present for acceptance or rejection." *Offer*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/offer (last visited Apr. 9, 2024).

### B. EHIA's Arguments to the Contrary

EHIA raises a number of arguments to the contrary. None is persuasive.

First, EHIA argues that "[i]n a legal or contractual context, 'offer' is a well-known term of art, especially when 'offer' is paired with 'acceptance.'" Pl's Mem. Supp. Summ. J. at 10, ECF No. 84. Because the Indenture is a contract, EHIA reasons that "offer" must mean "a manifestation of willingness to enter into a bargain"—in this case, to sell the improvements to the United States for value. *Id.* at 11 (quoting Restatement (Second) of Contracts § 24 (1981)). Although "offer" and "acceptance" are often used together in contractual settings, EHIA cites no precedential authority—and this Court can find none—

14

holding that "offer" is a term of art in contract law. Even if it were, our task would not be to interpret "offer" in the context of *any* contract but instead to interpret the word in the context of *this particular contract*. When that context "show[s] that the parties intended a meaning different from the technical or mercantile meaning, that other meaning will be honored." 11 *Williston on Contracts* § 32:4. This exception follows from "our primary purpose" in interpreting a contract: "to ascertain and give effect to the parties' objective intent." *Phillip*, 66 V.I. at 624–25. *See also Bristow v. Drake Street Inc.*, 41 F.3d 345, 353 (7th Cir. 1994) (Posner, J.) (cautioning courts to "[b]eware terms of art in law" because "[w]e must attend to what [the parties] meant by [their] use of the term."). Here, the context shows that JHPI ultimately intended to donate the Caneel Bay Resort to become "an integral part of the Virgin Islands National Park . . . under the jurisdiction of the Secretary [of the Interior]." 1983 Indenture at 2. EHIA's reading of "offer" is squarely at odds with that intent.

Second, EHIA argues that the analysis set out by the Virgin Islands Supreme Court in *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967 (2011) confirms its reading of "offer." Yet a *Banks* analysis is inappropriate in this case. That test, which is designed to ascertain whether a Restatement should supply a rule of common law in the Virgin Islands, applies only "when considering a question not foreclosed by prior precedent from" the Supreme Court of the Virgin Islands. *Gov't of V.I. v. Connor*, 60 V.I. 597, 603 (2014). *See also Banks*, 55 V.I. at 980 (observing that the Supreme Court of the Virgin Islands possesses the "supreme judicial power to shape the common law" in its jurisdiction). The Supreme Court of the Virgin Islands has stated on numerous occasions the rule governing contract

15

interpretation.  Specifically, it has held that courts should construe contracts "according to their plain meaning within the context of the document as a whole."  *Weary*, 57 V.I. at 170.  *See also, e.g., Tutu Park*, 55 V.I. at 719 n.14 (describing a court's job in interpreting a contract as determining "what [the parties'] words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used") (emphasis omitted).  That clear precedent governs this case, and so EHIA's use of a *Banks* analysis is unavailing here.

Finally, EHIA argues that the six months that Paragraph 8 gives the Government to decide whether to accept a termination offer "make sense only for an offer to transfer the Improvements for value."  Pl.'s Mem. Supp. Mot. Summ. J. at 16, ECF No. 84.  It says that if the Government were to receive the land for free, "it has no decision to make," for "it is always better to receive free improvements (regardless of their condition) than give up 150 acres of real property.  That decision does not require six months of deliberation."  *Id.* EHIA provides no evidence that commercial considerations motivated the stipulated response time, and it overlooks the many other plausible reasons the drafters may have had for creating a six-month interlude (e.g, assessing the resort's condition, finding a concessionaire, ensuring legal authority and budgetary capacity to manage the land, etc.).  Accordingly, this argument, too, fails to persuade.

16

Appx16

## C. Extrinsic Evidence

Because we find that the contract is unambiguous, we need not consult extrinsic evidence to aid our interpretation. However, for the sake of completeness, we will briefly discuss that evidence, which uniformly supports the Government's position.

Under Virgin Islands law, "'if the court finds that a contract is ambiguous and that the extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide' at the summary judgment stage." *White v. Spenceley Realty*, 53 V.I. 666, 678–79 (2010) (emphasis omitted) (quoting *In re Columbia Gas Sys. Inc.*, 50 F.3d 233, 241 (3d Cir. 1995)). EHIA argues that only certain types of extrinsic evidence are admissible, drawing a distinction between evidence about the party's language and evidence about the party's expectations. However, the case it cites for this proposition, *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 92 (3d Cir. 2001), was applying Pennsylvania law. *See* Pl.'s Resp. Order Supp. Br. at 12–13, ECF No. 145. We find no such distinction in the law of the Virgin Islands.

Three contemporaneous pieces of undisputed extrinsic evidence are especially relevant to this case. Most important is the letter that Laurance Rockefeller sent Interior Secretary Watt in 1982 to propose the transfer of Caneel Bay Resort. In the letter, Rockefeller suggests that the parties meet to discuss a proposal to "donate the Caneel Bay land inholding to the United States Government for inclusion in the Park," subject to a thirty-year reservation of use, at the end of which "JHPI would also donate the buildings and other facilities at Caneel Bay to the National Park Service." Rockefeller Letter at 1. Second, in a press release dated October 5, 1983, the parties announced that JHPI had the

17

Appx17

previous day "donated … approximately 150 acres of land at Caneel Bay" and agreed that at the end of the RUE, "the improvements also will be donated to the federal government." ECF No. 38-9 at 1.  The press release appears to be a joint production of the two parties, as it contains contact information for both the National Park Service and an office at Rockefeller Plaza.  Finally, in a "Statement of Closing" dated November 21, 1983, JHPI's lawyers wrote that "JHPI covenanted an offer to donate the Improvements to the Park Service at the end of the Retained Use Estate."  ECF No. 38-12 at 2.  Thus, individually and as a whole, these documents show that the parties shared an understanding that "offer" meant "an offer to convey at no cost."

### D.  Enforceability of the Gift

Finally, EHIA contends that if the Indenture does require the improvements to be conveyed at no cost, the conveyance would be unenforceable because it is not supported by consideration.  Specifically, EHIA posits that although the Indenture recites nominal consideration of one dollar, that consideration supports only the 1983 transfer of the land to the United States and not the future conveyance of the improvements at the RUE's termination.  It argues that if "offer to convey and transfer" does not mean offer for value, then the "offer" is merely an unenforceable promise to make a gift.

Not so.  EHIA fails to appreciate that a single consideration can support multiple promises, and it was clearly intended to do so here.  As Section 80 of the Restatement (Second) of Contracts provides, "[t]here is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone."  In the Indenture, JHPI promised (1) to transfer

18

the land to the United States immediately, and (2) to offer to convey the improvements to the United States if it sought early termination of the RUE.  These promises were made "for and in consideration of One ($1.00) Dollar . . . paid by Grantee to Grantor, the receipt and sufficiency of which is hereby acknowledged."  1983 Indenture at 1.  Thus, the one-dollar consideration supports both promises, making them legally binding.  *See also* Restatement (Second) of Contracts § 71 comment c (exchange of consideration for a promise to make a gift can create enforceable contract).  Moreover, in exchange for JHPI's promise to offer to convey the improvements upon early termination, the United States promised (1) to either accept the improvements or to relinquish title to the land, and (2) to give JHPI or its successor "a reasonable opportunity" to provide guest services should the Government accept the improvements and continue to operate public accommodations at Caneel Bay, 1983 Indenture at 5.  *See Julien v. Matthew*, No. 2022-0023, 2024 WL 1298481, at *5 n.5 (V.I. 2024) (quoting Restatement (Second) of Contracts § 71) (noting that a return promise can constitute consideration when it is bargained for).

Those promises were exchanged between the United States and JHPI, but as JHPI's successor and the holder of the interest in the improvements, EHIA assumed JHPI's obligation under Paragraph 6 to offer to convey the improvements should it seek to terminate the RUE before its natural explanation.  *See also* 2003 Indenture at 3, ECF No. 21–5 (conveying present and future interest in improvements to EHIA subject to the "obligations . . . to convey and transfer fee title in and to the Improvements" on the RUE's expiration date or in the event the United States declines offer of the conveyance).  The

19

Appx19

consideration provided for that conveyance, though nominal, suffices to render that obligation enforceable.

## IV.    Conclusion

Having examined "offer" as it is used "in the context of the entire agreement," *Tutu Park*, 55 V.I. at 713, we find that the term unambiguously means "an offer to convey the improvements free of charge."  Therefore, EHIA's offer to sell the improvements to the United States for $70 million and indemnification was not a valid offer for purposes of the indenture, including Paragraph 8.  Accordingly, we will GRANT Defendant United States' motion for summary judgment.  The RUE having expired on September 30, 2023 without a valid offer from EHIA, title to the resort's land remains with the United States, and title to the improvements thereon shall be conveyed and transferred to the Department of the Interior forthwith.

Plaintiff's motion for summary judgment is DISMISSED.  All pending motions in limine are DISMISSED as MOOT.

SO ORDERED.

Dated: April 18, 2024

By the Court,

CHERYL ANN KRAUSE
United States Circuit Judge

**DISTRICT COURT OF THE VIRGIN ISLANDS**
**Division of St. Thomas and St. John**

No. 3:22-cv-00044

EHI ACQUISTIONS, LLC
Plaintiff

v.

UNITED STATES OF AMERICA
Defendant

_____ORDER_____

     Defendant's Motion for Summary Judgment (ECF No. 36) is hereby GRANTED. Plaintiff's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (ECF No. 83) is hereby DISMISSED.  All pending motions in limine are DISMISSED as MOOT.

SO ORDERED.

Dated: April 18, 2024

                             By the Court,

                             CHERYL ANN KRAUSE
                             United States Circuit Judge

Appx21

DISTRICT COURT OF THE VIRGIN ISLANDS
Division of St. Thomas and St. John

No. 3:22-cv-00044


EHI ACQUISTIONS, LLC
Plaintiff

v.

UNITED STATES OF AMERICA
Defendant


1. Motion by Plaintiff for Reconsideration of Order and Memorandum Opinion

_____ORDER_____

On May 3, 2024, Plaintiff EHI Acquisitions, LLC filed a motion for reconsideration of the Court's order and opinion in this matter. ECF No. 164. Reconsideration is appropriate when, among other things, the "party seeking reconsideration shows . . . the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). EHI argues that the Court committed two clear errors that satisfy this standard. First, it says the Court erred factually by declaring that the Retained Use Estate (RUE) expired on September 30, 2023, because a mortgage was in effect on the RUE at the time and the Indenture prevents the RUE from ending as long as it is mortgaged. ECF No. 165 at 3–5. Second, EHI maintains that the only issue before the Court was title to the land beneath Caneel Bay Resort. According to EHI, the Court, by ruling not only on ownership of the land, but also on the disposition of the RUE and the Resort's improvements, deprived Plaintiff of its property without due process of law. *Id.* at 6–8. This Court's rulings, however, did not constitute error, much less clear error, so the motion to reconsider is DENIED.

Plaintiff is correct that the Indenture governing this dispute permits the RUE's owner to mortgage the RUE. ECF No. 1-3 at 3 ¶ 6(ii). It is also true that the Indenture states that "[s]o long as a mortgage of the Retained Use Estate is in effect, unless the mortgagee consents thereto . . . the Retained Use Estate shall not be terminated, and fee title to the land and title to the Retained Use Estate shall not merge." *Id.* at 4 ¶ 6(ii). Yet in interpreting this language to mean that the RUE must remain extant as long as it is mortgaged, EHI reads too much into the Indenture. As the Court's opinion explained, the Indenture manifests the parties' clear intent that the entirety of Caneel Bay Resort should "ultimately be an integral part of" the Virgin Islands National Park "for the public benefit." ECF No. 161 at 12 (quoting ECF No. 1-3 at 2 ¶ 2). Consistent with that express purpose,

1

the Indenture provides that the RUE "shall continue for a term of forty (40) years" from the date of the Indenture's execution—i.e., until September 30, 2023—unless the RUE's owner opts to terminate its interest before that date. ECF No. 1-3 at 2 ¶ 1. Adopting Plaintiff's reading of the Indenture would allow the RUE holder to indefinitely delay the contractually mandated expiration of the RUE, and thus to delay the resort's integration into the National Park. Because such a reading defeats the parties' clear intent, we decline to adopt it. *See Phillip v. Marsh-Monsanto*, 66 V.I. 612, 624–25 (2017) (a court's "primary purpose" when interpreting a contract "is to ascertain and give effect to the parties' objective intent").

This conclusion is bolstered by the Indenture's statement that the RUE "shall not be *terminated*" while the RUE is mortgaged. ECF No. 1-3 at 4 ¶ 6(ii) (emphasis added). In general, when the Indenture uses "termination," it means the mechanism, set out in Paragraph 8, by which the RUE's owner can seek to exit the RUE before its expiration. *See, e.g.*, ECF No. 1-3 at 2–3 ¶¶ 1, 3, 5; *id.* at 5. Thus, there is a difference between the RUE's *expiration*—which, per the Indenture, "shall" be on September 30, 2023, *id.* at 2 ¶ 1—and its *termination* according to the procedures in Paragraph 8. *See* Status Conference Tr. 61 (Plaintiff's counsel states that "the parties in paragraph eight specifically said, we're going to treat the way. . . these improvements are going to be conveyed differently than at the end of the retained use estate"). Because the Indenture unqualifiedly states that the RUE "shall" expire after 40 years, ECF No 1-3 at 2 ¶ 1, and because Plaintiff's interpretation would render that command ineffective, the best reading of the language invoked by Plaintiff is that it applies only to attempts to terminate the RUE before its expiration date. *See Weary v. Long Reef Condo. Ass'n*, 57 V.I. 163, 175 (2012) (Hodge, C.J., concurring in part and dissenting in part) (any reading that renders a contractual provision "pointless, superfluous, or ineffective . . . should not be entertained").

As for EHI's claim that ownership of the RUE and improvements was not presented to the Court, it, too, must fail. As the United States observes in its opposition to Plaintiff's motion, Plaintiff's complaint to quiet title "necessarily required resolution of ownership of the RUE and improvements." ECF No. 167 at 6 (capitalization altered). When presented with a contract, a court's office is not merely to *interpret* what the contract's words mean. We must also *construe* those words—that is, we must "determine [their] legal operation." *Ram Constr. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984). Here, the parties well know that the disposition of the land, improvements, and RUE are closely bound together by the 1983 Indenture's complex provisions; the fate of one interest affects the fate of the others. In this case, we interpreted "offer" to mean "an offer to convey at no cost." Our construction of the contract necessarily flows from that interpretation: EHI did not make a valid offer pursuant to the Indenture; the RUE subsequently expired; and so, according to the Indenture, the improvements now belong to the United States.

None of this should have been a surprise to the Plaintiff. In its prayer for relief, EHI asked the Court to "[q]uiet title in the Property and issue an order declaring that the United

2

States has no legal interest in the Property and that Plaintiff . . . owns all right, title, and interest to the Property." ECF No. 1 at 24. Earlier in the Complaint, Plaintiff declared that it was "the legal owner of the Property, *including both the Land and Improvements*," *id.* at 23 ¶ 80 (emphasis added), showing that it understood interests beyond title to the land were at stake. The Complaint also asked the Court to "[i]ssue any further relief as the Court may deem just, proper and equitable." *Id.* at 24. In addition, the parties discussed ownership of the RUE and improvements at great length at a status conference held before the Court on January 17, 2024. At the conference, amid extensive discussion of the Indenture's purpose and interpretation, Plaintiff's counsel agreed that if the RUE ran its full forty-year course, the improvements should be conveyed to the United States for no cost. Status Conference Tr. 63–64. This is to say nothing of the many rounds of motions, answers, and supplemental filings that have unfolded in this matter for almost two years, all of which have shown EHI to be a sophisticated party that is deeply familiar with the six pages of the 1983 Indenture.

Having interpreted and construed those pages, the Court has "grant[ed] the relief to which each party is entitled," Fed. R. Civ. P. 54(c), and EHI has not identified any "clear error of law or fact" or "manifest injustice" that would merit reconsideration, *Max's Seafood Cafe*, 176 F.3d at 677. Accordingly, Plaintiff's motion for reconsideration is hereby DENIED.

/s/ Cheryl Ann Krause
Circuit Judge
Sitting by Designation

Dated: May 22, 2024

Appx24

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. THOMAS AND ST. JOHN**

| | |
|---|---|
| EHI ACQUISITIONS, LLC, | |
| Plaintiff, | |
| v. | CIVIL NO. 2022-0044 |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

**<u>NOTICE OF APPEAL</u>**

Plaintiff EHI Acquisitions, LLC, by and through its respective counsel, hereby appeals to the United States Court of Appeals for the Third Circuit, pursuant to 28 U.S.C. § 1291, from the District Court's April 22, 2024, Memorandum Opinion and Orders denying Plaintiff's motion for summary judgment (EFC No. 161) and granting Defendant's motion for summary judgment (EFC No. 163) (collectively, "Summary Judgment Orders"), as well as the District Court's May 22, 2024, Order denying Plaintiff's motion for reconsideration of the Summary Judgment Orders. ECF No. 168.

Respectfully submitted,

Dated: July 17, 2024

By: */s/ Craig M. O'Shea*

Chad C. Messier (VI Bar 497)
Craig M. O'Shea (VI Bar R2072)
**DUDLEY NEWMAN FEURZEIG LLP**
1000 Frederiksberg Gade
St. Thomas VI 00802
Telephone: (340) 774-4422
cmessier@dnfvi.com
coshea@dnfvi.com

-and-

1

Appx25

Gregory Dovel (*pro hac vice*)
Julien Adams (*pro hac vice*)
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Tel: 310-656-7066
greg@dovel.com
julien@dovel.com

*Attorneys for Plaintiff EHI Acquisitions, LLC*

2